**UNITED STATES of America,**
**Appellee,**

v.

**Anthony COMO, Defendant-Appellant.**

**No. 311, Docket 29093.**

United States Court of Appeals
Second Circuit.

Argued Jan. 12, 1965.

Decided Jan. 26, 1965.

Nanette Dembitz, The Legal Aid Society, New York City (Anthony F. Marra, New York City, on the brief), for defendant-appellant.

Martin R. Gold, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for Southern District of New York, John S. Martin, Jr., Asst. U. S. Atty., on the brief), for appellee.

Before SMITH, KAUFMAN and ANDERSON, Circuit Judges.

KAUFMAN, Circuit Judge:

This appeal turns on whether the District Court was justified in denying defendant Como's pretrial motion, under Rule 41(e) (1) of the Federal Rules of Criminal Procedure, to suppress evidence seized during an allegedly illegal search. Como was convicted, after a jury trial, for violating 21 U.S.C. §§ 173, 174, by receiving, concealing, and facilitating the transportation and concealment of illegally imported heroin. The statutory mandatory minimum five-year sentence was imposed. Having concluded that the trial court erred in not suppressing the narcotics, which formed the sole basis of the charge, we reverse the judgment of conviction and order dismissal of the indictment.

The testimony and exhibits presented at both the hearing on the motion and the subsequent trial developed these facts relating to the search and seizure and Como's arrest on September 14, 1961. At the time of the events before us Como was working as a "special employee" of the Federal Bureau of Narcotics with agents Dolce and Gohde, in efforts to make a case against one Cangiano, a suspected narcotics seller. Simultaneously, though quite independently, two other Bureau agents—Schrier and Benjamin—were investigating the same suspect. Having received information that the unidentified occupant of Room 412 of the Hotel Elton, on East 26th Street in Manhattan, had been purchasing heroin from Cangiano, Agents Schrier and Benjamin went to the hotel, purportedly to identify the buyer and enlist his cooperation in the Cangiano case.

When Como entered the hotel lobby and asked the desk clerk for the key to Room 412, Schrier and Benjamin identified themselves and said they wished to speak with him. Como replied that he was a special employee and asked to make a confirmatory telephone call. But Schrier, indicating the desk clerk might eavesdrop, suggested, "Let's go up to your room and talk." Como acquiesced, although according to the agents' contemporaneous reports he "became very frightened." Nevertheless, the appellant pressed his efforts to eliminate the apparent confusion. Once inside his room he insisted that Agents Dolce and Gohde be called to "straighten this out." Schrier responded, "Before I make any phone calls, have you got any narcotics in the room?" Como's initial rejoinder was in the negative, coupled with a further plea that Dolce and Gohde be called. But, appellant's entreaties were of no avail. Schrier persisted in treating Como's disclosure of possession of any narcotics as a pre-condition to the telephone call. Como eventually yielded to these terms and reluctantly turned over six packages of heroin. Instead of placing the call, the agents immediately arrested him and thoroughly searched his room, uncovering various paraphernalia of the narcotics trade.

At the trial, Como claimed that he had received the drugs from Cangiano but insisted he was acting with the full knowledge and sanction of Agents Dolce and Gohde. The jury, however, must have rejected this defense, apparently on the basis of the testimony of Dolce and Gohde. Although these agents admitted that Como had been working on the Cangiano case, and was in fact released after his arrest to continue this work, they contended that he was never authorized to buy or hold narcotics.

## I.

■ Here the seizure was not made pursuant to a search warrant. Nor can it be justified as incidental to a valid arrest. Therefore, the reasonableness of the search or seizure and the propriety of the subsequent arrest depends entirely upon whether Como voluntarily consented, for it is an elementary maxim that a search, seizure or arrest cannot be retroactively justified by what is uncovered. We recognize, however, that consent to a search is not to be lightly inferred. United States v. Viale, 312 F.2d 595, 601 (2 Cir.1963). The guidelines are clear: "an accused's voluntary consent must be proven by clear and positive evidence. A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit. Moreover, to be voluntary, a consent must have been unequivocal, specific, and intelligently given." United States v. Smith, 308 F.2d 657, 663 (2 Cir.1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963); see also Channel v. United States, 285 F.2d 217, 219 (9 Cir.1960).

The Government's proof falls short of these exacting standards. On the contrary, the circumstances indicate that Como's consent was the product of deceit and coercion rather than an understanding and intentional waiver of a constitutional right. In arriving at this conclusion we recognize the difficulties which the Supreme Court and lower courts have encountered in attempting to define the permissible bounds of searches and seizures. Therefore, in few branches of the law is a precise case by case analysis and meticulous comparison of precedential authority so essential.

In Smith, supra, this Court found a voluntary consent because the defendant, *after* she had been properly arrested and legally searched, agreed to show the federal agents where she kept the remainder of her narcotics supply. But Smith, upon which the trial judge relied in denying the motion to suppress, is clearly distinguishable from this case. Here, the agents gained access to Como's room on the pretense of wanting to talk to him; their supposed aim of winning his cooperation in connection with an-

other investigation was belied by their persistent demands, once in the room, for an answer to their question as to whether he possessed any drugs. Cf. Pekar v. United States, 315 F.2d 319, 325 (5 Cir.1963); United States v. Ong Goon Sing, 149 F.Supp. 267 (S.D.N.Y. 1957). And, in marked contrast to Smith, but for Como's disclosure of the six packages of heroin, no arrest could legally have been made at the time.

▮ We believe that Como's "consent" to the seizure was coerced and induced by the agents preying on his anxiety to call Dolce and Gohde and inducing his belief that the call would be placed and all would be well once the narcotics were turned over. Cf. Haynes v. State of Washington, 373 U.S. 503 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Since Como's cooperation was predicated on his presumption—deceptively fostered by the agents—that the telephone call would be made *before he was arrested,* his consent was no consent at all. In deed, the beguilement may have had more serious effects for, at least from Como's vantage point, the promise to telephone the agents as soon as he disclosed possession implied agreement with appellant's reasonable assumption that the answers of Dolce or Gohde would confirm that he was a "special employee" engaged in the Cangiano investigation and thus would lift the threat of arrest. That the sequence of these events is critical becomes manifest if we assume the agents had made the call *before* requiring Como to disclose his possession of drugs. Then Dolce and Gohde, if their testimony at the trial was accurate, would have said that Como had no authority to hold narcotics and the appellant at that moment could, quite properly, have asked the officers to leave without permitting any search of his room.

### II.

▮▮ In addition, there was no intelligent waiver because Schrier and Benjamin camouflaged their purpose of investigating Como's personal criminal liability. We find no merit in the Government's contention, rooted in our decision in United States v. Sclafani, 265 F.2d 408 (2 Cir.), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959), that there was no duty to inform Como that he would be arrested if drugs were found. We view Sclafani as a narrow holding that consent to the continuation of an Internal Revenue Service investigation was not procured by stealth or deceit simply because the agents failed to disclose that their probe had expanded from civil to criminal purposes.[1] Here, indeed, the agents seem to have disobeyed Sclafani's command to avoid "obscur[ing] the warning inherent in their request for permission to search," 265 F.2d at 415, by inducing the tacit understanding that they would make the call that Como repeatedly said would exculpate him.

Although the line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw, we are persuaded that on the record before us there has not been a sufficient showing of true consent, free from chicanery or compulsion. To hold otherwise in these circumstances would, as the late Justice Jackson once eloquently remarked, "obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." Johnson v. United States, 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L. Ed. 436 (1948). The civilized standards of fundamental fairness developed over the years in this area must be zealously guarded by the trial and appellate courts,

1. Sclafani's limited scope is suggested by the Court's rationale: "A 'routine' tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that

the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and wilful omission." 265 F.2d at 414–415.

if the guarantees of the Bill of Rights are to be kept meaningful and not permitted to evaporate through silent abrogation.

We reverse the judgment of conviction and order dismissal of the indictment.[2]

2. This disposition moots Como's additional contention that it was impropr to deny his requests to inspect or to learn the contents of the Narcotics Bureau file dealing with his activities.