**UNITED STATES of America ex rel. Lawrence METZE, Petitioner,**

**v.**

**The STATE OF NEW YORK and the Warden of Sing Sing Prison, Respondents.**

**No. 69 Civ. 1460.**

United States District Court
S. D. New York.

Aug. 1, 1969.

**1360**

Eleanor Jackson Piel, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for respondents, Lillian Z. Cohen, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

This habeas corpus petition presents a serious question as to the validity under the Fourteenth Amendment—duplicating the Fourth for this purpose, Aguilar v. Texas, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)—of a search warrant leading to the conviction and prison sentence against which the writ is sought. More specifically, the problem centers upon the affidavit of a police officer which was the basis for issuance of the warrant.

The story, as it concerns us, begins on March 7, 1965, when Detective Robert R. Rua of the Narcotics Bureau, New York City Police Department, made the affidavit and a Criminal Court Judge issued the warrant. The affidavit reads as follows:

"1.  I am Det. Robert R. Rua #2468 N.B. N.Y.CPD.

"2.  I have information based upon information given to me by a confidential informant who in the past has given me information that had led me to mkake [*sic*] arrest which has led to convictions of more than five people for violations of the narcotics laws as Felonies.

Observations made on premises 1470 Sterling Pl., Bklyn. on March 6, 1965 from 7:00 PM to 9:00 PM, during which time known drug users and sellers were observed entering and leaving the premises under observation. Because of observation and information derived through confidential informant, it is ascertained that the appropriate time to serve this search warrant would be in the night time.

"3.  Based upon the foregoing reliable information and upon my personal knowledge there is probable cause to believe that such property namely narcotics and narcotic paraphernalia and may be found in the possession of

Lawrence Mets or at premises 1470 Sterling Pl Apt. 4H, Bklyn. NY.

"WHEREFORE, I respectfully request that the court issue a warrant and order of seizure, in the form annexed, authorizing the search of [1]

and directing that if such property or evidence or any part thereof be found that it be seized and brought before the court; together with such other and further relief that the court may deem proper.

"No previous application in this matter has been made in this or any other court or to any other judge, justice or magistrate."

There is no evidence that the Judge considered anything other than the affidavit when he issued the warrant.[2]

On the next night, March 8, Detective Rua and two of his colleagues executed the warrant by entering and searching petitioner's four-room apartment in the presence of petitioner and his wife. The search lasted about an hour.[3] In the course of it, the officers found three marijuana cigarettes in the top drawer of petitioner's bureau. Having completed the search, they placed petitioner under arrest.

In the brief conversation attending and immediately following the arrest, Detective Rua asked petitioner if he had any more narcotics. According to Rua, whose disputed testimony was accepted in the State Court and is accepted here (see note 3, *supra*), petitioner replied:

"Yes, I do, but I don't want to get my wife involved. I have them in the trunk of my automobile downstairs."

The detective said "Let's go." They went. They left the building with one of Rua's fellow officers; they crossed the street to the automobile; petitioner opened the trunk; and they took out a locked suitcase which petitioner had pointed to as containing narcotics.[4] Then they returned to the apartment where the suitcase was opened and petitioner's account of its contents was confirmed. The police found and seized from it 413 glassine envelopes containing a total quantity of heroin worth perhaps $7,500 in the "retail market" and an array of implements used in the illicit merchandising of the drug.

Petitioner was indicted in three counts, one of which charged as a misdemeanor illegal possession of the marijuana found in his bureau drawer. The other two counts were felony charges arising from the heroin in the automobile.

Petitioner moved in the state trial court for suppression of the marijuana and heroin. After an evidentiary hearing, the motion was denied. The Judge concluded, first, that the search of the apartment had been conducted "pursuant to a lawful search warrant." As to the suitcase and its more serious contents, he found that these had been taken "with the defendant's consent, freely and unequivocally given, and not * * * under the compulsion of au-

1. This blank in the form of affidavit was not filled in.

2. The closest approach to this point is in the transcript of the state suppression hearing where Detective Rua was asked whether he had been questioned by the issuing magistrate and said he could not remember.

3. This proposition and several others, some of major importance to the constitutional questions, were disputed at the suppression hearing. All were resolved against petitioner, who was characterized by the Judge as "glib and evasive, and * * * a liar." Petitioner's wife was likewise found to have been "obviously lying to help her husband and herself." This court has accepted the findings of the State Court, which appears to have conducted an adequate hearing. Cf. Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

4. Petitioner said he was handcuffed after being arrested. Detective Rua could not remember, but thought "[p]ossibly" petitioner had been handcuffed.

thority, for the entirely plausible reason as testified to by the detective that the defendant did not want to involve his wife in his misdeeds."

Having failed in his motion to suppress, petitioner pled guilty to one of the felony counts and was sentenced to a term of from three to seven years. Then, following New York's "enlightened statute," United States ex rel. Rogers v. Warden of Attica State Prison, 381 F.2d 209, 214 (2d Cir. 1967), allowing appellate review in such cases, he pressed the search-and-seizure question on appeal. In the Appellate Division, Second Department, Mr. Justice Nolan dissented from the affirmance without opinion, "being of the opinion that the search warrant pursuant to which the evidence against appellant was obtained was issued without probable cause (cf. United States ex rel. Rogers v. Warden of Attica Prison, 381 F.2d 209, 2d Cir., * * *)." People v. Metze, 28 A.D.2d 934, 282 N.Y.S.2d 981 (1967). The Court of Appeals, though it also affirmed without opinion, did so by the narrowest possible division. Chief Judge Fuld and Judges Burke and Breitel dissented and voted to reverse "on the ground that the affidavit upon which the search warrant was based was insufficient to establish probable cause to believe that a crime was being committed in defendant's apartment." 21 N.Y.2d 806, 288 N.Y.S.2d 635, 636, 235 N.E.2d 774, 775 (1968). The Supreme Court denied certiorari on February 24, 1969, 393 U.S. 1091, 89 S.Ct. 883, 21 L. Ed.2d 786, and denied rehearing a month later, 394 U.S. 939, 89 S.Ct. 1199, 22 L.Ed.2d 474. Then the petitioner came here.[5]

▇ With suitable hesitation, considering the fate of petitioner's arguments thus far, this court concludes that the writ he seeks must be granted. Like the four State Judges who dissented from affirmances of his conviction, I find that the search warrant was issued without a showing of probable cause. The Trial Court should have suppressed not only the three marijuana cigarettes, but also the deadlier cache of heroin to which petitioner ("possibly" handcuffed) led the police directly after the lawless search and arrest.

The briefs, the arguments and the court's reflections have ranged rather widely. In the end, however, the decision may be explained in fairly simple terms. The affidavit of Detective Rua, which was the total basis for issuance of the search warrant, began with a reference to the hauntingly familiar "confidential informant."[6] It asserted, sufficiently, the reliability of this person. Cf. United States ex rel. De Rosa v. La Vallee, 406 F.2d 807, 808 (2d Cir. 1969). But then, despite a Gertrude Stein-like repetition of the word "information," it actually said nothing of any kind about what sort of information was supposed to have been received from that individual. This is not simply a case, which is bad enough, where the affiant failed to tell "underlying circumstances," Aguilar v. Texas, *supra*, 378 U.S. at 114, 84 S.Ct. 1509; Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Here, so far as the affidavit reveals, the informant gave no concrete information of any kind.[7]

5. After some 22 months of confinement, petitioner was freed on bail pursuant to a certificate of reasonable doubt pending state appellate proceedings. He has remained in that status. His application for bail pending the present proceeding was granted without opposition.

6. "I have information based upon information given to me by a confidential informant who in the past has given me information that has led me to mkake

[*sic*] arrest which has led to convictions of more than five people for violations of the narcotics laws as Felonies."

7. While the barrenness of the affidavit in this respect could not be improved for the State at the suppression hearing, it was emphasized in a way which is not altogether immaterial. Detective Rua testified that the informant had not reported (1) when he had last seen peti-

In short, the business about the informant was worthless.

The next sentence of the affidavit becomes, as a result, the entirety of what the State must rest upon as the showing of probable cause. Accordingly, this passage merits repetition:

"Observations made on premises 1470 Sterling Pl., Bklyn. on March 6, 1965 from 7:00 PM to 9:00 PM, during which time known drug users and sellers were observed entering and leaving the premises under observation."

These words convey only a scanty message, and that without excessive intelligibility. We are not told whose "observations" are being reported, although the succeeding paragraphs—referring to "observation and information derived through confidential informant," and to the affiant's "personal knowledge"—may be liberally construed to show that the "observations" were those of Detective Rua.[8] We are not told whether "premises" means the *apartment building* or petitioner's "Apt. 4H," which is first mentioned two sentences later in the statement of the affiant's conclusion that narcotics were believed to be discoverable in "premises 1470 Sterling Pl. Apt. 4H." This substantial element of vagueness could be fatal in itself under the decision in United States ex rel. Rogers v. Warden of Attica State Prison, 381 F.2d 209 (2d Cir. 1967). The State has rather elaborate answers, and it may be noted (although the magistrate did not have this before him) that Detective Rua testified at the hearing to having conducted the observations of petitioner's fourth floor apartment from a hiding place on the roof. We may pass this, however, merely using the occasion

to wish that (1) police officers, invoking grave powers to invade the privacy of citizens, could say in simple English what they think entitles them to do that in any particular case, or (2) magistrates would see fit to ask pertinent questions and make suitable records when they authorize such measures upon garbled or opaque papers. In this case, giving the benefit of every doubt to the State, the key sentence about "observations" remains inadequate.

The sentence said, at best, that the affiant, during a two-hour period on one evening, had seen "known drug users and sellers" entering and leaving petitioner's apartment. It did not say how many such persons had been seen. More importantly, it did not say how people earned the officer's characterization of them as "known" users and sellers. What basis was there for this conclusion about unidentified people? Were they persons who had been seen in illicit uses or sales of drugs? Convicted? Rumored in the neighborhood to be users and sellers?

If it could be supposed that such questions—demanding less conclusory statements and at least "some of the underlying circumstances," Aguilar, *supra* 378 U.S. at 114, 84 S.Ct. 1509—impose excessively minute burdens upon the police, the record of the instant case helps to dispel the supposition. Detective Rua was asked about the unnamed "users and sellers" at the suppression hearing. His foggy answers serve as chilling reminders of the duty magistrates owe to require some concrete showing of "probable cause," not vague generalities, before invasions by the police are authorized.[9]

tioner or (2) if he had ever been at the building containing petitioner's apartment.

8. Rua so testified at the suppression hearing—again, of course, going beyond what the State may (or does) fairly invoke as having been before the magistrate.

9. "THE COURT: On March 6th, though, you were there with McGuire?
"THE WITNESS: Yes, I was.

"THE COURT: 7 to 9 p. m.
"Q And was it during that time that you say you saw certain people enter the apartment; is that right?
A That's correct.
"Q Did you know these people? A I had seen them on prior occasions.
"Q Had you had any dealings with these people who allegedly entered the apartment of the defendant? A Yes.

**1364**

A conclusion in the affidavit that petitioner himself was a "known" seller or user would amount to little more than "a bald and unilluminating assertion of suspicion * * * entitled to no weight in appraising the magistrate's decision." Spinelli v. United States, *supra*, 393 U.S. at 414; and see *id.* at 418–419, 89 S.Ct. at 588, 590; see also Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). There is no good ground in logic or sense why similar assertions about other, unidentified people should be weightier grounds for searching the apartment.

Granting, however, that the report of "observations" could have served, with other things, as a part of the requisite showing, cf. United States ex rel. De Rosa v. La Vallee, 406 F.2d 807, 808 (2d Cir. 1969), it was patently insufficient in itself to justify issuance of a search warrant. On any other view, thousands of urban dwellings are open for ransacking following observed visits by people "known" to use or sell drugs.

■ The conclusion that the warrant and search of the apartment were unlawful leads inevitably to a like result with respect to the heroin petitioner "voluntarily" delivered from the automobile trunk. The Judge who denied the motion to suppress, starting from his different view concerning the search warrant, moved with no difficulty to a finding that the contraband was seized from the automobile "with the defendant's consent, freely and unequivocally given"—"given by the defendant knowingly and voluntarily under no compulsion, but out of the natural affection for his wife in whose name the car was registered, and particularly in view of the fact that she was a Civil Service employee whose job was in jeopardy by the slightest connection with criminal activity." The notion of "voluntariness" in this context is not merely factual, of course, but in large measure a matter of federal constitutional law. E. g., Culombe v. Connecticut, 367 U.S. 568, 603–06, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); cf. Bumper v. North Carolina, 391 U.S. 543, 547–48, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). And so, even if we accepted the State Court's view as to the search warrant, there might be room to question how "voluntarily" and "freely" one may be deemed to "consent" to delivery of the wherewithal for his own imprisonment after an uninvited intrusion by three or more officers, an hour-long search of one's apartment, the discovery there of contraband, and one's consequent arrest, with or without

"THE COURT: You say in your affidavit you knew them to be known drug users and sellers?
"THE WITNESS: That's true, your Honor.
"THE COURT: Based on what, did you make that statement?
"THE WITNESS: Based on the fact that I had seen these individuals on prior occasions. I had stopped them, and talked to them, and had information on a couple of them.
"Q Did you ever arrest any of these fellows? A No, I did not.
"Q Did you see the defendant on March 6, 1965? A No, I did not.
"Q Did you see the defendant when you were allegedly making your observations of these alleged people at or near the apartment involved herein? A No, I did not.

"THE COURT: Did you see them go into the apartment?
"THE WITNESS: Yes, I did, your Honor.
"THE COURT: How long about would they stay?
"THE WITNESS: Between five and ten minutes, your Honor.
"THE COURT: Come out?
"THE WITNESS: They came out.
"Q Did you stop any of these people whom you saw allegedly going into the apartment and leaving the apartment? A No, I did not.
"Q Did you take down their names?
"THE COURT: He stayed up on the roof; is that so?
"THE WITNESS: That's right.
"THE COURT: You never moved from your point of observation on the roof?
"THE WITNESS: No, your Honor."

handcuffing.[10] But that relatively subtle problem is not now in the case. In the view this court has taken, either of two, distinguishable but cognate, propositions requires suppression of the heroin delivered up from the automobile:

(1) That this evidence was obtained as the direct consequence of—and, therefore, was "tainted" by—the unconstitutional search. Wong Sun v. United States, 371 U.S. 471, 485–88, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); cf. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Phelper v. Decker, 401 F.2d 232, 237–38 (5th Cir. 1968).

(2) Perhaps more simply and more directly, that the State cannot be deemed to have borne its "heavy burden of proving voluntary consent, see United States v. Como, 340 F.2d 891 (2d Cir. 1965)," United States v. Jordan, 399 F.2d 610, 614 (2d Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968), when that so-called "free and voluntary" act of self-destruction follows immediately from the apparently incriminating results of a lawless search and arrest under the deceptive auspices of an invalid warrant. Cf. Bumper v. North Carolina, 391 U.S. 543, 546–50, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); United States v. Como, *supra*; Alexander v. United States, 390 F.2d 101, 109–10 (5th Cir. 1968); Villano v. United States, 310 F.2d 680, 684 (10th Cir. 1962); Judd v. United States, 190 F.2d 649, 89 U.S.App.D.C. 64 (1951); see also Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

To conclude, then: petitioner's motion to suppress should have been granted. His conviction must be nullified under the Fourteenth Amendment. His petition is granted and he will be freed unless the State is prepared, within 30 days, to try him upon a plea of not guilty without the forbidden evidence. In the meantime, this court's order allowing his release on bail will remain in effect. Should respondents appeal within 30 days, this ruling will be stayed pending disposition of the appeal, subject, of course, to the views and orders of the Court of Appeals.

So ordered.

---

10. Because judges tend to know police officers as collaborators from a coordinate branch of government, usually most accommodating and agreeable to us, we may not always feel on our own pulses their possible impact on other people in other situations. Thus, although he later found only "free" and "voluntary" "consent" as the basis for petitioner's delivery of the heroin, the trial Judge cut off questioning about the immediately antecedent circumstances of the entry, search, and arrest by the police:

"Q How many officers were with you at the building all together? There is, for instance, the unknown officer at the door when you got there; right? A Right.
"Q Then there is your partner; is that correct? A My two partners.
"Q That is three. Then there is yourself is four and several federal agents?
"THE COURT: Downstairs in the street?
"Q Downstairs? A Right.
"Q How many federal agents? A Two.
"Q Six. Were there any more than six? A No.
"THE COURT: Excluded. Let's get to something important. This has no bearing on the issue in this case, if there were a hundred officers there. You claim that the search warrant was improperly issued and executed. Let us get to that issue.
"MR. PELCYGER: I claim other things, too.
"THE COURT: Let's get to that issue. I'm not interested in how many officers are there."