Commonwealth *v.* Brown, Appellant.

Argued October 1, 1969.  Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*James A. Stranahan, III,* with him *D. W. Patterson,* for appellant.

*Robert F. Banks,* Assistant District Attorney, with him *Joseph Nelson,* First Assistant District Attorney, and *Edward M. Bell,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, January 30, 1970:

Appellant, Donald Brown, was found guilty of second degree murder and is appealing the trial court's judgment of sentence entered after denial of his motions for a new trial and in arrest of judgment. As the basis for his appeal, appellant contends that the Commonwealth did not present a sufficiently strong case to merit consideration by the jury, that the evidence was not sufficient to support the verdict, and that the court below erred in refusing to suppress evidence concerning a gun, bullets and holster obtained from appellant and found to have been used in the commission of the crime.

Appellant's major contention is the latter one, and as to it the facts are as follows: On January 19, 1968, John Burke, Chief of Police of Grove City, met with State Police Officer Thomas Petrovich to discuss several pending cases; the Lumley case, the Dillaman case, and the Coulson case (the one with which this Court is now concerned). Burke told Petrovich that he was interested in locating the appellant to discuss with him various aspects of at least two of the three cases. Appellant was located the next day in his New Castle apartment, and the interrogation of Brown took place in the police car because Brown did not want his wife to see police in the apartment. Appellant received his *Miranda* warnings and then discussed with the officers certain aspects of the Lumley case. After about twenty minutes Mrs. Brown appeared, and the parties began discussing the difficult financial situation in which the Browns found themselves. Mrs. Brown had been attempting to sell their stereo to obtain money

for food and rent and had packed their bags in anticipation of being dispossessed that very day. The officers then took Mrs. Brown to the municipal building so that she could apply for assistance. After they returned, Petrovich asked appellant whether he owned any guns, and appellant said he did, producing a receipt for one he had recently purchased. Petrovich asked why he did not try to sell the gun rather than the stereo, and Brown replied that he did not think he could get much money for it. Petrovich stated he knew the man who had sold the gun, felt he could get some money for it and asked what Brown would accept. Brown said he felt $25 was the minimum and then gave possession of the gun, ammunition and holster to the officer. Petrovich did sell the gun back to the original owner (Aiken) for $30 and then asked Aiken if he could borrow it back for a few days in order to perform ballistic tests on it.

On cross-examination Petrovich stated he wanted to have ballistic tests performed because Coulson had been shot with a .32 calibre revolver and Brown had volunteered that his gun was of that type. At the time of the taking of the gun from appellant, neither officer was investigating the Coulson murder and neither felt he had enough evidence to secure a search warrant. At most they had a suspicion that Brown might have been involved. The ballistic tests showed that appellant's gun was the weapon from which the bullets that killed Coulson were fired.

Appellant contends that the manner in which the gun reached the hands of the police violated the Fourth Amendment's prohibition of unreasonable searches and seizures. He asserts that the case is one in which consent to an otherwise invalid search and seizure should itself be invalidated because procured through deceit and misrepresentation. *Commonwealth v. Wright*, 411 Pa. 81, 190 A. 2d 709 (1963); *Common-*

wealth v. *Anderson,* 208 Pa. Superior Ct. 323, 222 A. 2d 495 (1966); *United States v. Reckis,* 119 F. Supp. 687 (D. Mass. 1954). In *Wright,* four hours after having arrested the defendant, police officers returned to his apartment and told his wife that he had confessed and had sent them for the "stuff." This latter statement was false, but not knowing this the wife showed them where the money was located. This Court ordered the money evidence suppressed. *Reckis* involved a statement by agents of the Alcohol Tax Division to the owner of the land that they had been sent by the boss "to fix the still." On the basis of that representation, Reckis showed them where the still was located. The court held that under those circumstances the consent was not free and willing.

The Commonwealth does not agree that this is the proper framework in which to place this case. It asserts that the situation is governed by the decisions in *Lewis v. United States,* 385 U.S. 206 (1966); *Hoffa v. United States,* 385 U.S. 293 (1966); *Lopez v. United States,* 373 U.S. 427 (1963); and *United States v. Haden,* 397 F. 2d 460 (7th Cir. 1968). Basically those cases involve undercover work by government or police officials and stand for the proposition that the Fourth Amendment affords no protection to those who mistakenly place their confidence in such undercover agents. As applied to this case, appellee contends they hold that the presence of deceit and misrepresentation in dealings between the defendant and the police do not require the suppression of evidence surrendered "voluntarily" in the sense that if the situation were as the defendant believed it to be the defendant wanted (or at least did not object to having) the object or information in the possession of the "police." In effect, the Commonwealth is contending that there was no search and seizure at all because—". . . a search is a probing or exploration for something that is con-

cealed or hidden from the searcher: a seizure is a forcible or secretive dispossession of something against the will of the possessor or owner." *U. S. v. Haden,* supra at 465, and here appellant retrieved the property from its storage location himself and gave it to the policeman.

The problem for this Court is to determine the permissible extent of police power in light of these United States Supreme Court decisions. *Lewis* (involving sales of marijuana to a federal narcotics agent), *Hoffa* (involving the planting of a government informer in defendant's hotel room to overhear conversations), and *Lopez* (involving an attempted bribe of an Internal Revenue agent) clearly do not require the police to be completely open and truthful as to their identity and purpose when dealing with suspects. They recognize that undercover work is an essential weapon in the police arsenal. In this case the "undercover" work was not as to Petrovich's identity as a policeman but rather as to his motives in offering to sell the gun. It appears to us that there is no real difference between this deception and those found permissible in *Lewis, Hoffa* and *Lopez.* In all three of those cases the defendants were deceived as to the use that was going to be made of the things (in *Lewis,* narcotics; in *Hoffa,* words; in *Lopez,* money and words) transmitted to the government agents, and in reliance on that mistaken belief "voluntarily" made that transmittal. "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa,* supra at 302. Here appellant did not explicitly reveal his wrongdoing, but he put in the hands of the police the instrumentality of the crime which was crucial evidence in establishing his guilt. There is no legal difference between the two so far as the Fourth Amendment's prohibition is concerned.

It is a possible basis of distinction between this case and *Lewis* and *Lopez* that the transmittal in those cases was the crime itself, while here the transfer was only of evidence. In the *Hoffa* case, however, the United States Supreme Court by implication stated that it is of no consequence whether the transfer represents the crime or is only evidence of a crime previously committed.

The fact that Petrovich did exactly what he told appellant he was going to do is not the basis of this decision. The United States Supreme Court has not grounded the right of the police to use deceptive devices on the necessity of the agent's literally telling the truth to the suspect. Regardless of whether the agent tells a lie or only a half-truth, a deception is still taking place, and it is the validity of that deception as a police device that is at issue.

Also the fact that appellant had no rights in the gun after its sale is not the crucial factor because the question is the validity of the steps that led to the relinquishment of rights in the property. It is the determination that those steps were constitutional that leads to the conclusion that the defendant has no right in the property.

It is not necessary for this Court to determine what deceptive devices are improper in light of *Lewis, Hoffa* and *Lopez* although that is a very difficult question as the United States Supreme Court seems to have granted broad powers to the police. *The Supreme Court, 1966 Term,* 81 Harv. L. Rev. 112, 191-4 (1967). It is enough to state that in light of those three United States Supreme Court decisions, the police officer's (Petrovich's) tactics were constitutional, and the court below properly refused to suppress evidence of the gun, holster and bullets.[1]

---

[1] We make no distinction among the gun, holster and ammunition because the manner in which they were handed to Petro-

Appellant's other contention is that the trial court erred in overruling his motion for a new trial and in arrest of judgment since the circumstantial evidence on which the Commonwealth basically relied was insufficient to have had the case submitted to a jury and insufficient to support the jury's verdict. We hold that the evidence, although not overwhelming, was sufficient to support the verdict. "The test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial—is whether accepting as true all the evidence upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged." *Commonwealth v. Gooslin,* 410 Pa. 285, 286, 189 A. 2d 157 (1963).

The evidence indicates that appellant had a bread route that included the deceased's isolated country home, that appellant had a great need for money and that the victim's wallet was missing. The Commonwealth also showed that Brown, by his own admission, travelled from New Castle to Slippery Rock on the day in question thus putting him only fifteen miles from the scene of the crime. The most damaging evidence concerns the murder weapon. Appellant purchased it in New Castle only a few hours before the murder occurred, and it was the testimony of the State Police expert that the fatal shots came from that weapon. Brown testified that he gave possession of the gun to his brother, Sam, the afternoon before the murder, but Sam testified that he did not have the gun during the period in question. The jury was justified in disbelieving appellant's version. Appellant also attempted to prove his whereabouts on the night of the

vich indicates appellant believed they were to be sold with the gun. Therefore, even though Petrovich did not offer explicitly to sell the holster and ammunition, we treat all three items as part of one package.

murder, but the testimony of his wife in that regard was contradictory, and the jury had a basis for not believing the alibi. Therefore, although the evidence against appellant is not overwhelming, there is enough that the court below acted properly in submitting the case to the jury, and there is enough to support the jury's verdict.

The judgment of sentence is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

This case rests unhappily between two principles of law, both of which are at once equally weighty, apparently logical, and infuriatingly difficult to resolve with each other. The facts, ably stated in greater detail by the majority, are briefly as follows. Donald Brown was suspected of involvement in several recent crimes in and around Grove City, Pennsylvania, and it was determined by local law enforcement officials that he ought to be questioned. During the course of the questioning it was established that Brown was both in need of money and in possession of a recently purchased .32 calibre revolver. One of the officers questioning Brown was aware that just such a weapon had been involved in a recent murder, and suggested to Brown that he might sell the revolver to get some money. After several such suggestions and an offer by the officer to negotiate the sale himself, Brown turned the gun over to the officer for that purpose. The officer did in fact sell the weapon (to the dealer who had originally sold the gun to Brown) on Brown's account, but he then "borrowed" the gun from the purchaser and had ballistics tests run. The question then is whether the manner in which the Commonwealth came into possession of this weapon violated the fourth amendment's prohibition against unreasonable searches and seizures. I am compelled to disagree with the

10

majority's conclusion that those proscriptions were not transgressed.[1]

The first relevant line of cases hold that the fourth amendment's restrictions can be violated by behavior which is deceitful or fraudulent as well as by that which is coercive or stealthful. *Gouled v. United States,* 255 U.S. 298, 41 S. Ct. 261 (1921).[2] But not all deceit or guile works such a violation, and the problem lies, as usual, in drawing the line between prohibited and permissible deception.

In *Gouled* an old business acquaintance of the defendant was contacted by the police and asked to conduct a search of the defendant's office. Gaining admission by virtue of his acquaintance with the defendant, the informer proceeded to conduct an extensive search of the office when the defendant left the room. The Court said: "The prohibition of the Fourth Amendment is against all unreasonable searches and seizures and if for a government officer to obtain entrance to a man's house or office by force or by an illegal threat or show of force, amounting to coercion, and then to search for and seize his private papers would be an unreasonable and therefore a prohibited search and seizure, as it certainly would be, it is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth instead of by force or coercion. . . . [W]hether entrance . . . be obtained . . . by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently

---

[1] It needs almost no mention that the protections of the fourth amendment are fully applicable against the states. *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684 (1961).

[2] Interestingly enough, *Gouled* was cited for this proposition in *Hoffa. Hoffa v. United States,* 385 U.S. 293, 301 87 S. Ct. 408, 413 (1966).

and secretly made in his absence, falls within the scope of the prohibition of the Fourth Amendment." 255 U.S. at 305-06, 41 S. Ct. at 263-64.

There are two cases decided under the rationale of *Gouled* which are strikingly similar to the one before us now. In *United States v. Lipshitz,* 132 F. Supp. 519 (E.D. N.Y. 1955), a revenue agent was in the process of making a regular audit of the defendant's books. Before he had concluded the examination, which was being performed with the consent of the defendant, a "special agent" got in touch with him and, explaining that the defendant was suspected of possible criminal violations, instructed him to conduct a more extensive audit. The court held that the information "seized" during the expanded examination was obtained in violation of the fourth amendment. The government argued that the defendant consented to the search, but the court said that the consent went *only* to the more limited routine audit and did *not* authorize the expanded search.

Even more on point is *United States v. Ong Goon Sing,* 149 F. Supp. 267 (S.D. N.Y. 1957). Sing, an immigrant who was suspected of having entered the country illegally, had filed a court action seeking to establish the American citizenship of his two children, both of whom were then living in Hong Kong. An immigration service agent visited Sing, purporting to seek information relevant to this lawsuit. Actually, the agent was interested in the legality of Sing's presence in the country. The agent was permitted to examine some papers in Sing's possession, and took some with him with Sing's consent. At Sing's deportation trial the papers and other evidence obtained by the agent were suppressed. ". . . [T]he movant's surrender of that portion of the papers which he claimed to own was further tainted by the representation that they would be used for his benefit and the concealment by

12

the Special Agent and the Investigator of the true purpose of their visit." 149 F. Supp. at 269.[3]

---

[3] Many of the cases following *Gouled* involving violations by fraud of the fourth amendment have discussed the problem not in terms of the scope of the search, but rather in terms of whether an alleged consent to the search was vitiated by the searching authority's use of guile in obtaining that consent. "[T]o be considered voluntary and effective a consent to search must be unequivocal, specific and intelligently given; . . . conduct which is two-faced, vague, or the product of coercion or trickery, actual or implicit, is ineffective. United States v. Thompson, 356 F. 2d 216 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S. Ct. 1591, 16 L. Ed. 2d 675 (1966) ; United States v. Smith, 308 F. 2d 657, 663 (2d Cir.), cert. denied, 372 U.S. 906, 83 S. Ct. 717, 9 L. Ed. 2d 716 (1963) ; and . . . 'consent to a search is not to be lightly inferred.' United States v. Viale, 312 F. 2d 595 (2d Cir.), cert. denied, 373 U.S. 903, 83 S. Ct. 1291, 10 L. Ed. 2d 199 (1963) ; United States v. Como, 340 F. 2d 891 (2d Cir. 1965) ; United States v. Alberti, 120 F. Supp. 171, 174 (S.D. N.Y. 1954)." *United States v. Lewis,* 274 F. Supp. 184, 187 (S.D. N.Y. 1967).

See, also, *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938) ; *Schoepflin v. United States,* 391 F. 2d 390 (9th Cir. 1968) ; *Cipres v. United States,* 343 F. 2d 95 (9th Cir. 1965) ; *Commonwealth ex rel. Whiting v. Cavell,* 244 F. Supp. 560 (M.D. Pa. 1965) ; see J. Nintz, "Search of Premises by Consent," 73 Dick. L. Rev. 44 (1968) ; Comment, "Effective Consent to Search and Seizure," 113 U. Pa. L. Rev. 260 (1964).

Of all the cases which discuss violations by deceit of the fourth amendment by focusing on the voluntariness of consent, one of the most interesting is *Robbins v. MacKenzie,* 364 F. 2d 45 (1st Cir.), cert. denied, 385 U.S. 913, 87 S. Ct. 215 (1966). There an officer knocked on an apartment door and requested entry to question the occupant about a recent crime. Upon entry into the room he saw some fruits of the crime sitting out in the open. The court held the evidence admissible saying: "Here the police were not seeking to bypass the commissioner. They did not . . . misstate their purpose in seeking entry. . . . *Rideout* [the officer] told the truth; he exercised no ruse; he threatened no force. After entry he made no attempt to engage in a search." * * * "We would agree . . . that where the officer's real objective is search and seizure the householder's consent should not only be clearly voluntary, but also specifically directed toward search and not merely toward entry." 364 F. 2d at 49.

Under the rationale of *Gouled* and its progeny it would seem that evidence is rendered inadmissible if uncovered by an officer while exceeding the reasonably anticipated scope of a consensual intrusion into an individual's protected rights.

If the cases discussed so far were the only ones applicable there would be no problem with the instant one. They are not. Another line of cases, three of which are fairly recent Supreme Court decisions, hold that the government may indeed employ certain deceptive practices.

In *Lopez v. United States*, 373 U.S. 427, 83 S. Ct. 1381 (1963), a federal tax investigator was propositioned by an individual he was investigating. After reporting the bribe offer to his superiors the investigator agreed to a second meeting with the subject, at which meeting he recorded the substance of the conversation. He was permitted to testify at the trial. The Court did not enter into an extensive discussion of the fourth amendment, but merely held it inapplicable, saying: "[w]e decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is constitutionally protected communication." 373 U.S. at 438, 83 S. Ct. at 1387.

In *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408 (1966), an informer worked his way into the Hoffa entourage during the time that Hoffa was being tried for a violation of the Taft-Hartley Act. Hoffa was subsequently convicted of attempting to fix the jury in the Taft-Hartley trial, largely on evidence supplied by the informer. The conviction was affirmed by a seven man Supreme Court, four in the majority, one in dissent, and two of the opinion that the writ of certiorari was improvidently granted. In discussing the fourth amendment the majority said: ". . . What the Fourth Amendment protects is the security a man relies upon when he places himself or his property

14

within a constitutionally protected area. . . . There he is protected from unwarranted governmental intrusion. . . . In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. . . . The petitioner . . . was relying upon his misplaced confidence that Partin would not reveal his wrongdoing." 385 U.S. at 301-02, 87 S. Ct. at 413.

The third case is *Lewis v. United States,* 385 U.S. 206, 87 S. Ct. 424 (1966), decided the same day as *Hoffa.* In this case an undercover federal narcotics agent called the home of a suspected marijuana seller to inquire about purchasing a quantity of that drug. The seller acknowledged that he was able to fulfill the agent's needs. The agent then drove to the seller's residence, identified himself as the caller, and the transaction was completed. After one more similar transaction the seller was arrested. The Supreme Court affirmed the conviction eight to one, two concurring. As I read the opinion the majority based its decision on two considerations. First, they felt that ruling out the deception used by the agent would render nearly all undercover work virtually unconstitutional *per se,* and that such a result would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest." 385 U.S. at 210, 87 S. Ct. at 427. Secondly, the Court was impressed by the fact that ". . . petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics. . . . During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a

necessary part of his illegal business." *Ibid.* Beyond citing these two factors the Court did nothing except distinguish the case from those petitioner had advanced as controlling.

The fourth and most recent case in this area is *United States v. Haden,* 397 F. 2d 460 (7th Cir. 1968). In that case the authorities learned that Haden had contacted several foreign chemical producers requesting information about certain processes used in the manufacture of narcotic drugs. An agent, posing as a German chemist, called on Haden. Although Haden at first denied any knowledge of what the agent was talking about they eventually got together and the agent agreed to demonstrate a process used in the manufacture of heroin to Haden for a fee. Haden was to supply the raw material—morphine sulphate tablets. After several false starts Haden got some tablets and turned them over to the agent; they met in a parking lot and Haden told the agent that the tablets were under the rug on the right front floor of his car. While Haden looked on from a distance the agent retrieved the tablets from Haden's car. Haden was then arrested. The court cited to *Lopez, Hoffa* and *Lewis* and affirmed.

The problem now is to determine whether the deceptive conduct utilized in this case is permissible under the *Lopez-Hoffa-Lewis* rationale or is proscribed by the logic of *Gouled* and its progeny.[4]

---

[4] "The principle [limiting the application of the Fourth Amendment] that appears to be emerging from the cases is that the Fourth Amendment applies only to searches that intrude upon reasonable expectations of freedom from government search. Although this principle is more congruent with the Fourth Amendment's central purpose to protect the privacy of the citizen from unreasonable government investigation than the property principle of Olmstead, it is difficult to apply. This difficulty was made patent in . . . Lewis v. United States, Hoffa v. United States, and Osborn v. United States. The Court has been eager to abandon

I believe that a crucial distinction between these lines of cases lies in whether the law enforcement officer had to exceed the reasonably anticipatible scope of his consensual intrusion into the defendant's protected security to discover the criminality. All of the decided cases can be rationalized through the use of this distinction, which, I am convinced, is a distinction with a logical difference. When an individual voluntarily exposes obvious criminal behavior to another the risk that the person in whom he confides will betray the confidence rests with the individual who voluntarily exposes himself. However, whenever criminal behavior or evidence of criminality is discovered *only* when the scope of an otherwise consented to intrusion into the constitutionally protected security of another is *exceeded*, I believe that the fourth amendment is violated.

In *Lopez, Hoffa, Lewis,* and *Haden* the eventual defendants all openly committed or admitted to criminal behavior in the presence of the government agent. No additional action by the government agent was necessary to positively establish the defendant's criminality. The only thing separating the defendants from almost certain criminal prosecution was their (misplaced) confidence that the person to whom they disclosed their venality would not reveal it to others.

In the *Gouled* line of cases the government agents who eventually revealed the defendant's criminality became aware of that criminality only after invading the defendant's security more deeply than consented to. They had to take some additional action, not reasonably a part of the consensual intrusion, in order to

the limiting principle of the past, but inattentive to the more difficult task of articulating and applying a limiting principle for the future." E. Kitch, "Katz v. United States: The Limits of the Fourth Amendment," 1968 The Supreme Court Review 133, 134-35 (1968).

establish the defendant's criminality. In *Gouled* the informer gained admission to the defendant's office with his consent, but proceeded to conduct a secret and unauthorized search. In *Ong Goon Sing* the Special Agent removed and used defendant's papers for a reason different from that given to the defendant. And in *Lipshitz* the agent conducted an audit more extensive than that consented to by the defendant.

Although it is a close question, I believe that the instant case is of the *Gouled* variety. The officer took the gun from defendant's possession for a reason different from that given to gain his consent. As in the other cases the government carried out an extensive search and seizure by deceitfully gaining the defendant's consent to a lesser invasion of his constitutionally protected security. I believe therefore that it constitutes a violation of the fourth amendment.

There is another factor that impels me. toward the conclusion that the behavior in the instant case violated the fourth amendment—the fact that the misrepresentation was made by an acknowledged government agent. There are two reasons why I feel this factor important. First, I believe that there is an element of coercion in any request made by an officer of the law. Refusing a government agent's seemingly reasonable request for information or offer of help inevitably casts suspicion on the person who so refuses, thereby creating a not-so-subtle pressure to comply with the request or offer if at all possible. Secondly, I believe that law enforcement personnel ought to be highly credible. I think that one of the factors responsible, and legitimately so, for the holdings in *Ong Goon Sing* and *Lipshitz* is. the feeling that acknowledged law enforcement officials should not resort to lies.[5]

---

[5] I realize that *Lopez* also involved a lie propounded by an acknowledged government official. However, that case is different

A third reason for holding this behavior violative of the fourth amendment is simply that it permits law enforcement officials to circumvent the warrant requirements of that provision. Why would any officer ever attempt to build up a case of probable cause before he tried to get the evidence through guile and deceit? Approval of the procedure used in this case would, I fear, lead inevitably to its broader utilization. Whatever one thinks of the morality and legality of this conduct in the context of an isolated incident, it would certainly become more distasteful as it became more prevalent.

I would hold that the officer's conduct in this case resulted in a violation of Brown's fourth amendment rights. An acknowledged officer of the law misrepresented his intentions to the suspect, and as a result was able to carry out a search *in excess* of that consented to by the suspect—one which would never have been consented to if the officer's true intentions were revealed. I believe that this kind of official misbehavior is exactly the kind of thing the fourth amendment was intended to outlaw, and I would not sanction it now.

Mr. Justice POMEROY joins in this dissent.

---

in that the defendant's bribe offer made it inevitable that the agent would betray someone's trust, either Lopez's or the government's. If one requests and expects a government officer to act deceitfully he ought not be surprised if he and not the public is the victim of that deceit.