**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Albert HADEN, Defendant-Appellant.**

**No. 16230.**

United States Court of Appeals
Seventh Circuit.

July 1, 1968.

Terence F. MacCarthy, Chicago, Ill., for defendant-appellant; Thomas D. Decker, Chicago, Ill., of counsel.

Eugene Robinson, Thomas A. Foran, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Gerald M. Werksman, Eugene Robinson, Asst. U. S. Attys., of counsel.

Before CASTLE, Chief Judge, and HASTINGS and KILEY, Circuit Judges.

HASTINGS, Circuit Judge.

Appellant-defendant Albert Haden appeals from a judgment of conviction entered February 14, 1967, after a jury found him guilty of transferring narcotic drugs without the required order form in violation of 26 U.S.C.A. § 4705(a).[1] The trial court sentenced appellant to ten years' imprisonment.

The jury found him not guilty on counts charging him with distributing narcotic drugs outside their original stamped package in violation of 26 U.S.C.A. § 4704(a) and with knowingly transporting and concealing drugs unlawfully imported into the United States in violation of 21 U.S.C.A. § 174.

The evidence, viewed in a light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), follows. In May, 1962, the Federal Bureau of Narcotics learned that appellant had written to a German chemical firm inquiring about processes for the conversion of morphine sulphate to diacetyl-morphine (heroin) and that he had written other foreign chemical firms, one of them in November, 1962, about the processing or supplying of opium alkaloids. On June 19, 1963, a federal narcotics agent, posing as a German chemist, called on appellant at his home in Chicago, Illinois. The agent told appellant he had been referred to him by an employee of the German chemical firm and wanted to talk with him about the manufacture of alkaloids. Appellant denied writing to the German firm and terminated the conversation.

The agent made the same representations in a letter mailed to appellant July 2, 1963. In the letter he listed a telephone number by which appellant could reach him.

Two weeks later, on July 15, 1963, appellant telephoned the agent and arranged a meeting at appellant's home. At the meeting appellant told the agent that he wanted to manufacture heroin, but that his earlier attempts to obtain the process from foreign chemical com-

1. "It shall be unlawful for any person to sell, barter, exchange, or give away narcotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary or his delegate."

panies and from scientific literature were unsuccessful. He offered to pay the agent for teaching him the process. The agent pretended to be surprised and reluctant. Appellant stated that he had spent a sizable amount of money in his efforts to produce heroin, and showed the agent a basement laboratory where he said he had conducted his experiments. In response to the agent's question about the quality of morphine base used in his experiments, appellant said he had used morphine sulphate as a base. At the close of the meeting he told the agent to meet him again on July 17 at a Chicago hotel.

At their July 17 meeting the agent offered to assist appellant for a fee of $5,000. Appellant accepted the offer. He told the agent he could get large quantities of morphine sulphate tablets through an employee of a Detroit chemical company. The agent then told appellant that if the morphine sulphate was in tablet form he would want a sample of the tablets for analysis. Appellant said he would provide a sample and asked the agent to call him on July 19 to determine whether the sample had been obtained.

The agent called appellant on July 19. Appellant informed him that he had not been able to obtain the morphine sulphate and that it would take four to six weeks to obtain it. Appellant asked how he could contact the agent. The agent told appellant he had no fixed address, but would contact appellant.

In a letter mailed to appellant August 26 from New York, the agent listed an Indianapolis address at which he could be reached. He also stated that he would call appellant should he come to Chicago.

One and one-half months later on October 7 the agent called appellant. Appellant arranged a meeting on October 8. At that meeting he told the agent he had been unable to obtain the morphine sulphate tablets. He asked the agent what equipment would be required to demonstrate the process for producing heroin, and the agent said he would fur-

nish a list. At appellant's request the agent agreed to produce five 100-gram lots of heroin for appellant's instruction using morphine sulphate as a base. The agent said he had to return temporarily to Germany and would contact appellant on his return about November 15, 1963.

On November 20, the agent again called appellant and the latter arranged a meeting. At that meeting appellant reported that he had been unable to obtain the morphine sulphate. The agent indicated doubt about appellant's sincerity and suggested they forget the project. Appellant assured the agent that he was serious about learning to produce heroin and asked for the list of necessary equipment and materials. The agent then read a list of laboratory equipment and chemicals. Appellant told the agent how payment would be made and what quality and yield he would consider acceptable. Other details of the project were discussed.

The agent called appellant on December 3 and appellant arranged a meeting on December 5 at a Chicago hotel. At the meeting, after learning that appellant had not obtained the morphine sulphate, the agent announced he was backing out of the project. Appellant reaffirmed his sincerity and asked the agent to contact him near the end of January, 1964.

The agent called appellant on February 17, 1964. Appellant arranged a meeting at a Chicago hotel on February 18. He explained that for personal reasons he had been unable to work on the project but would soon be able to go into operation. He told the agent to call him on February 25.

The agent called on February 25 and appellant arranged a meeting for February 27. At that meeting he asked the agent to accompany him to his home. While en route appellant spotted a car of the Federal Narcotics Bureau following him. He dropped the agent off, after telling him to call back later that evening.

The agent made the requested call and, pretending fear of arrest, announced his withdrawal from the project. Appellant assured him that all was well and arranged another meeting that evening.

At that meeting appellant announced he was ready to proceed and had large quantities of morphine sulphate available. He told the agent he would let him have twelve grams of morphine sulphate tablets for an initial operation producing pure morphine and asked the agent to meet him on the following day, February 28.

The two met on February 28. Appellant said he had the morphine sulphate and described a clandestine procedure by which the agent was to return the pure morphine derivative to him. After assuring himself that they were not followed, appellant motioned to his parked car and told the agent: "Go over to my car. Open the door. Under the right front mat you will find the stuff. Take it and leave. I will be on the other side watching while you do this." The agent crossed the street, opened the right front door of the car, leaned inside, lifted the right front floor mat and found an object wrapped in tissue paper. He removed the object, backed out of the car, closed the door, placed the object in his pocket and walked away.

The object removed from the car was a plastic tube containing white tablets. The tablets were analyzed and found to be morphine sulphate.

On March 2, the agent met appellant pursuant to plan and reported success in deriving pure morphine from the tablets he obtained on February 28. The agent then left appellant without delivering the pure morphine to him as planned. Appellant was arrested later that day and a search of his home was conducted *pursuant to a search warrant.*

Appellant urges three grounds for reversal of his conviction.

First, he contends that the morphine sulphate removed from his car on February 28, 1964 was inadmissible as the product of an unlawful search and seizure in violation of the Fourth Amendment. He contends that the agent's action in entering the car and removing the package containing the narcotics was a search and seizure and that his apparent consent to the search was vitiated by the trickery and deceit employed by the agent.

Appellant places principal reliance on Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The pertinent issue in that case was whether the Fourth Amendment was violated by the surreptitious taking of documents from the accused's office by a government agent posing as a social visitor. The Court held that it did, stating that "whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, *any search and seizure subsequently and secretly made in his absence,* falls within the scope of the prohibition of the Fourth Amendment * * *." (Emphasis added.) 255 U.S. at 306, 41 S.Ct. at 264.

The Government contends there was no violation of the Fourth Amendment, placing principal reliance on three recent decisions of the Supreme Court. The first of these is Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), where the facts were similar to the pertinent facts in this case. There an undercover federal narcotics agent posing as a customer called defendant and inquired about the possibility of purchasing marihuana. Defendant invited the agent to his house, where he sold the agent a quantity of marihuana. After a second, similar transaction, defendant was arrested. His motion to suppress as evidence the marihuana and conversations between himself and the agent was denied and he was convicted. He argued that the agent's entrance into his house and removal of the marihuana

violated the Fourth Amendment and that his apparent consent was vitiated by the deception practiced by the agent. Principal reliance, as in the instant case, was placed on *Gouled*.

The Court held that the Fourth Amendment had not been violated since defendant had invited outsiders into his home for the purpose of transacting unlawful business, the agent had entered the home for the purpose contemplated by defendant and the agent had neither seen, heard nor taken anything not contemplated by the defendant. The Court distinguished *Gouled* on the ground that in that case the agent, after obtaining entry by means of deception, secretly conducted a search and seized documents.

Decided the same day as *Lewis* was Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). There a business acquaintance of defendant, who was a paid government informant,[2] frequented defendant's hotel suite and heard incriminating conversations carried on by defendant in his presence. At defendant's trial the trial court denied a motion to suppress evidence of the conversations. Defendant's argument was that by listening the informant conducted a search in violation of the Fourth Amendment and that defendant's consent to his presence in the suite was vitiated by his concealment of his role as an informant.

The Court found no violation of the Fourth Amendment. It noted that the informant was in defendant's suite by invitation and that the incriminating conversations were either directed to him or knowingly carried on in his presence. The Court concluded that the informant had violated defendant's misplaced confidence in his silence but that he had not violated defendant's legitimate reliance on the security of his hotel suite. The Court observed that it had never expressed the view "that the

Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." 385 U.S. at 302, 87 S.Ct. at 413.

The third case principally relied upon by the Government is Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). There an Internal Revenue agent, after defendant offered him a bribe, feigned willingness to accept payoffs for ignoring tax violations. At trial he testified to incriminating statements made to him by defendant in the latter's office. The agent recorded one of the conversations on a hidden recording device and the recording was admitted into evidence. Defendant argued that the agent's entrance into his office by means of misrepresentation and his subsequent "seizure" of defendant's conversations violated the Fourth Amendment.

The Court rejected the contention that the "taking" of defendant's conversations violated the Fourth Amendment, on the ground that the agent was in defendant's office by consent and did not surreptitiously seize anything without defendant's knowledge and that the only evidence obtained were statements which defendant well knew could be used against him. The Court also rejected the contention that the recording of one of defendant's conversations violated the Fourth Amendment. It held the use of the recorder was justified to obtain the most reliable evidence of a conversation that the agent was fully entitled to disclose, noting that the recorder had not been used to listen in on a conversation the Government would not otherwise have heard.

 *Lewis, Hoffa* and *Lopez* clearly indicate that the Fourth Amendment affords no protection to the person who voluntarily reveals incriminating evidence to one who is a government agent in the mistaken belief that the latter

---

2. Although the witness' status was disputed, the Court proceeded on the premise that he was a government informant compensated for his services.

will not disclose it.[3] One who intends a conversation or transaction to be private and takes reasonable steps to keep it private is protected from government intrusion unauthorized by warrant or well-defined special circumstances. Cf. Katz v. United States, 389 U.S. 347, 88 S.Ct. 2258 (1967). But he is not protected from the consequences of error if he places trust in the silence, duplicity or complicity of a government agent or informer. Neither is he protected from the consequences of error if he places physical evidence in plain view of government agents. See Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Applying these principles to the instant case, we conclude that the Fourth Amendment was not violated. Appellant voluntarily revealed and surrendered the morphine sulphate tablets to the Government when he instructed its undercover agent to take them from his car. The agent violated only appellant's misplaced confidence. He did not conduct a search of appellant's car nor did he seize the tablets. Compare Gouled v. United States, supra. He took only what appellant contemplated he would take.

Appellant misconstrues the agent's action as a search and seizure. A search is a probing or exploration for something that is concealed or hidden from the searcher; a seizure is a forcible or secretive dispossession of something against the will of the possessor or owner. Both connote hostility between the searcher and the person whose property or possessions are being searched or sought.

When he entered appellant's car and lifted the floor mat the agent was not probing or exploring for something hidden from him. Once appellant confided to him the location of the package it ceased to be hidden from him; he needed no exploratory effort to locate it. When he placed the package in his pocket and walked away he was not taking it against appellant's will.

Appellant might have retrieved the package from the car himself and handed it to the agent. Had he done so we assume he would not now claim that the agent searched his car and seized the morphine sulphate. The difference between that mode of transfer and the one he chose is, however, without legal significance. When appellant disclosed the location of the package containing the drug to the agent and instructed him to get it, he waived the privacy of his car for the limited purpose of allowing the agent to retrieve the package. In retrieving it the agent did not exceed the limits of the waiver.

As a second ground for reversal appellant contends the record establishes as a matter of law that he was entrapped, or at least reveals an egregious encouragement to crime, requiring his acquittal. He contends the record shows that he had no prior disposition to commit the crime with which he is charged and that the agent instigated and insistently

3. The vitality of the pertinent holdings in *Lewis, Hoffa* and *Lopez* was in no way undermined in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). There the Government intruded by means of an electronic eavesdropping device on a conversation it would not otherwise have heard. The Court held that this "violated the privacy upon which [appellant] justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." 389 U.S. at 353, 88 S.Ct. at 512. "Misplaced confidence" was not involved.

We have no occasion to decide whether the Fifth or Sixth Amendment affords protection to a person who makes incriminating post-arrest admissions to an undercover agent "planted" by the Government. See generally, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The Supreme Court recently declined to consider the question, dismissing a writ of certiorari as improvidently granted, over the dissent of four justices. Miller v. State of California, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968).

urged the acquisition and transfer of the morphine sulphate.

██ Entrapment is not established as a matter of law unless it is patently clear from the undisputed evidence that government agents originated the criminal design and implanted in the mind of an innocent person the disposition to commit the crime. Sherman v. United States, 356 U.S. 369, 372–373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Government action in merely providing the opportunity or facilities for the commission of the crime does not constitute entrapment. Sherman v. United States, supra; Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

██ Appellant apparently concedes, as he must, the existence of sufficient evidence to support a finding that he originated the criminal scheme to manufacture and sell heroin. Evidence of his pre-June, 1963 efforts to discover the process for making heroin would support such a finding. Nor can there be doubt that the Government's evidence would support a finding that appellant had the disposition to effectuate that criminal scheme. After their brief, innocuous first meeting it was appellant who approached the agent with the scheme for making heroin and offered to pay the agent for teaching him the process. Appellant readily admitted to the agent his past attempts to manufacture heroin.

However, as appellant points out, he was not indicted and convicted for scheming to manufacture and sell heroin, but for transferring morphine sulphate to the undercover agent without the requisite order. The question is whether he was entrapped into that transaction. We conclude that he was not.

Appellant's letters to chemical firms in 1962 requested the process for producing heroin from morphine sulphate. Morphine sulphate first entered into the conversations between appellant and the agent when the agent asked about the quality of the morphine base appellant had used in his experiments. Appellant responded that he had used morphine sulphate and later stated that he had a connection who would supply him with 500–1,000 grams of morphine sulphate tablets each month. The agent's request for a sample, which appellant readily promised to provide, was made after the agent agreed to teach appellant the process for producing heroin. Implicit throughout their conversations was the understanding that appellant would furnish the chemicals for use in the instruction. That understanding took concrete form when on October 8 appellant asked the agent to produce five 100-gram lots of heroin using morphine sulphate tablets so that he would have five opportunities to observe the process. Finally, on the day before the tablets were transferred, appellant told the agent he would give him twelve grams of the tablets with the understanding that the agent reduce them to pure morphine.

This evidence establishes that the design to use morphine sulphate as a base for producing heroin originated with appellant and that as an essential element of that design appellant contemplated transferring morphine sulphate to the agent for experiments and demonstrations. The evidence also establishes that appellant had the disposition to commit the crime of transferring the tablets without an order. On each of the three occasions that the agent feigned disillusionment or reluctance and pretended to withdraw from the project, appellant reaffirmed his resolve to continue. The crime was not the product of creative activity by the Government. Cf. Sorrells v. United States, supra.

██ We attach no critical significance to the fact that all contacts between appellant and the agent after July 15 were precipitated by the agent's telephone calls to appellant. With a single possible exception, the calls were made at appellant's instruction or pursuant to a prior understanding. Each of the meetings between the two, except the first one, was arranged by appellant. The Government's evidence clearly indicates that appellant willingly carried on

the relationship. His failure to produce the morphine sulphate tablets sooner was explained by his difficulties in obtaining them. His failure to pursue the scheme more rapidly and to contact the agent by mail was explained by this abundant caution, which clearly appears in the evidence.

As a third ground for reversal appellant complains of the trial court's failure, at a hearing on his motion for new trial, to question its deputy marshal and clerk concerning an alleged jury request for a copy of the indictment during its deliberations. He contends the verdict is inherently inconsistent and reveals the jury's confusion. The allegation was evidenced only by the affidavit of appellant's trial counsel, made on information and belief. Otherwise, there was no showing that the jury made such a request. The trial judge, it appears, was available to the jury during its deliberations. In colloquy at the hearing on the motion, the court indicated that it was not its practice to give the jury a copy of the indictment and that, had a request been communicated to it, it would have denied the request. Under the circumstances, we find no error.

The judgment of conviction is affirmed.

Affirmed.