**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Stephen R. SMITH, Defendant-Appellant.**

### No. 74–1034.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1974.

Decided Jan. 9, 1975.

Rehearing Denied Feb. 4, 1975.

---

Dom J. Rizzi, Chicago, Ill., for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Joel V. Merkel, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

FAIRCHILD, Circuit Judge.

Appellant Smith was convicted by a jury of four counts charging distribution and possession of Methylenedioxy Amphetamine (MDA) and of cocaine. 21 U.S.C. § 841(a)(1). Government proof tended to show a transfer April 1, 1973 of 32.09 grams MDA and .61 gram of cocaine. Appellant was sentenced to concurrent terms of five years, with confinement for six months and probation for the remainder.

Appellant Smith claimed at trial that he was "pressured into this sale" by agents and an informer, and the district court submitted the issue of entrapment to the jury to the apparent satisfaction of Smith. Since the jury found against him, though adequately instructed, Smith urges on appeal that entrapment must be deemed to have been established as a matter of law.

Smith's theory appears to be that evidence of repeated requests by government agents for assistance in obtaining narcotics, all preceding the sale by appellant, and the absence of evidence, beyond the sale itself, tending to show Smith's predisposition to sell the controlled substances, required acquittal as a matter of law. He relies principally on Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), where the Supreme Court reversed a conviction, concluding that entrapment had been shown as a matter of law by the undisputed testimony of prosecution witnesses, the defense having called no witness of its own.

In the present case, however, there was a conflict in testimony as to the number of contacts between the government agents and Smith before the sale. Accordingly it will be necessary to analyze the evidence to determine whether the view of the evidence most favorable to supporting the jury verdict compels the conclusion that there was entrapment.

As stated in Sorrells v. United States, 287 U.S. 435, 441–442, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932), "the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. . . . A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." It was said in *Sherman,* 356 U.S. at 372, 78 S.Ct. at 821, "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

"[T]he entrapment defense prohibits law enforcement officers from instigating a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.'"

United States v. Russell, 411 U.S. 423, 428, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973), quoting *Sorrells*, 287 U.S. at p. 448, 53 S.Ct. 210. The test is whether "the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials." (Emphasis supplied.) *Sherman*, 356 U.S. at p. 372, 78 S.Ct. at p. 821, quoting *Sorrells*, 287 U.S. at p. 451, 53 S.Ct. 210.

"Entrapment as a matter of law is established only where undisputed testimony makes it patently clear that an otherwise innocent person was induced to commit the act complained of by the trickery, persuasion, or fraud of the government agent." United States v. Millpax, Inc., 313 F.2d 152, 156 (7th Cir. 1963), citing *Sorrells*; United States v. Haden, 397 F.2d 460, 466 (7th Cir. 1968) cert. den. 396 U.S. 1027, 90 S.Ct. 574, 24 L.Ed.2d 523, citing *Sherman* and *Sorrells*.

The testimony of several special agents, called by the government, tended to establish the following version: On Sunday, April 1, 1973 at 3 p. m., Special Agent Casteel and Joseph Hale, a paid informer, went to the trailer where Smith lived. This was at Carbondale, Illinois, and Smith was a student at Southern Illinois University. Hale introduced Casteel to Smith and asked if Cronson, Smith's roommate, had made arrangements for the purchase of either cocaine or MDA. Smith said Cronson wasn't there, but Smith had contacted a source of supply and Smith would handle the transaction. Smith said the purchase would probably take place later that day, and asked Casteel where he would be. Casteel gave him his room number at a motel.

At 5 p. m. that day, Smith came to the room. Casteel and Hale were there, with Special Agent Bushendorf secreted in the bathroom. Smith told Casteel he could buy an ounce of cocaine for $1,050 or an ounce of MDA for $375. Casteel agreed to buy the MDA and asked for a small sample of the cocaine to see whether he wanted to buy a quantity later. Smith then telephoned someone

he called Roger, informed him of the order, and said he would be over in a few minutes. Smith left, returned about an hour later and delivered the MDA, for which payment was made. He asked to see Casteel's and Hale's wallets to see if they were police. After that he turned over a small sample of cocaine.

Cross-examination of Special Agent Casteel developed testimony that Special Agent Jovonovich had made contacts with Smith's roommate before April 1. Casteel had not met Smith before April 1. He had contact with him three or four times after April 1, and attempted to make additional purchases. On those occasions, Smith told Casteel his source had sold all he had. Smith was not arrested until May 17.

Cross-examination of Special Agent Bushendorf brought out that he was in charge of the investigation in Carbondale which began during the latter part of March, 1973 and continued to May 17. There were several agents in the unit. Hale had been a useful informer in Indiana and was referred by another agent to Bushendorf. Hale came to Carbondale and was instructed to make himself acquainted with the scene there and see what he could find out about the peddling of drugs. Bushendorf testified that, including the visit April 1, agents or Hale had visited the Smith trailer three times at the most.

Hale and Jovonovich did not testify.

Smith testified that he met two men named Joe (who turned out to be Hale and Jovonovich) on Sunday, two weeks before the sale. They had met Cronson before and had been asking how they could buy large quantities of drugs. He described meeting with Hale and either Jovonovich or Casteel on five occasions before the day on which he made the sale. They repeatedly spoke "very strongly about how they wanted to make a fast possession" of huge amounts of drugs so they could make money. "They were asking Bill, Chris, and myself if we could get them for them, and if we couldn't, who could?" He described the attitude of the students to-

ward the agents as "rather cold," and was surprised the agents kept coming back. Except for deception as to identity, there was no testimony of any misrepresentation by the agents or the informer. Smith testified to statements that were, on their face, threats to "break into our trailer and take our belongings," but conceded these things were said in a joking manner. The only pressure claimed, in substance, was that the requests were repeated a number of times before the sale. There was no play upon sympathy as in *Sherman.*

Supporting the claim of repetitions of requests, Smith testified that five meetings took place in two weeks before the sale. He said the first meeting definitely took place after March 25 and could have been March 31. He placed the sale in mid-April. His testimony concerning the meetings was corroborated by several defense witnesses, who also said the sale occurred in mid-April. There is documentary proof, however, that the MDA and cocaine delivered to Casteel were received from him by mail at the laboratory in Chicago April 3. This strongly corroborates the agents' testimony that the sale was April 1. The jury could well have believed that the defense witnesses were confused as to the sequence of events; that Hale and Jovonovich met Cronson on one occasion and Smith on another late in March; that there were no other meetings before April 1; and that many of the conversations took place after the April 1 sale. Under this version the numerous repetitions of the request, accomplishing a change from refusal to acquiescence by the defendant, as present in *Sherman,* were lacking here.

Accordingly we conclude that the entrapment issue was, at best for Smith, a jury question, and the defense was not established as a matter of law.

The judgment appealed from is affirmed.

SWYGERT, Chief Judge (dissenting).
I respectfully dissent.

The evidence relating to the conduct of federal narcotics agents in entrapping a naive young man and inducing him to sell illegal drugs is so overwhelming that his conviction should be set aside and a new trial ordered.

According to my readings of the record the Government prosecutor at trial inadvertently or otherwise constructed a red herring having to do with calendar dates relative to the operative facts so as to obfuscate the real issue of entrapment. Then on appeal, in his brief and at oral argument, he invited us to validate his approach. Unfortunately, the majority upholds the conviction on the ground there was sufficient conflict in the evidence so as to preclude us from considering the entrapment issue. But the only major conflict concerned the dates when the crucial events took place; there seems to be little dispute about their occurrence.

The evidence must be narrated in detail to demonstrate that the defendant was not predisposed to sell drugs and only through the deliberate efforts of the agents was he induced to commit the crime with which he was charged.

Stephen R. Smith, now twenty-two years old, lives in Long Grove, Illinois with his parents and eight brothers and sisters. In March and April 1973, Stephen was in his fourth year of studies at Southern Illinois University at Carbondale, Illinois. For three years he was a pre-med student, but then switched to civil engineering. During each of the summer recesses he worked at various jobs as a mechanic, a carpenter, and a painter, using his earnings to help finance his schooling.

Christopher Cronson and William Clayton graduated with Stephen Smith at Adlai Stevenson High School in Prairieview, Illinois. The three matriculated at Southern Illinois University. Early in 1973, the boys rented a trailer about a mile and a half from the campus, where they lived while attending the university.

The first quarter of the 1973 school year ended about March 12, 1973. Some-

time thereafter, on a Saturday morning, most likely March 17,[1] undercover agent Joseph Jovonovich and "informant" Joseph Hale[2] picked up Christopher Cronson in their car on a highway leading from Carbondale to Edgewood Mobile Estates where the trailer occupied by Cronson, Clayton, and Smith was located. Cronson had stayed overnight at the University in Carbondale. After introducing themselves as Joe Hale and Indiana Joe, the two asked Cronson if he could locate some drugs, mescaline or cocaine, for them. Cronson said he did not have any drugs, but did agree to give them a marijuana cigarette in return for a ride home. At the trailer Cronson was reminded by "Indiana Joe" of his promise; thereupon Cronson produced a marijuana cigarette. The two smoked the "reefer" with William Clayton who had been awakened at their arrival with Cronson. Hale and Jovonovich said they were "new in town" and inquired generally about the Southern Illinois University. Clayton testified, "They asked repeatedly if me or Chris [Cronson] could obtain drugs for them." After approximately a half-hour Hale and Jovonovich left the trailer and drove Cronson back to the University.

Late in the afternoon of the following day (Sunday) Hale and Jovonovich returned uninvited to the trailer. (Cronson testified, "We are talking roughly about the Sunday two weeks before the sale.") It was during the supper hour and all three of the boys, Cronson, Clayton, and Smith were there. Hale and Jovonovich began talking to Clayton and Cronson about how to deal in marijuana and then asked the boys again, "Can you get any drugs for us?" Clayton testified, "Mostly they were asking for pounds of LSD and cocaine and amphetamines." Hale and Jovonovich asked what the possibilities were of the boys getting them the drugs. Smith testified that when Hale asked whether the three young men could get some cocaine for him, "[w]e more or less ignored the conversation because we did not ever think

---

1. The conflict in the testimony centers on when the operative events occurred. Although the defendant and another witness for him said that the sale of the drugs to the federal agents happened after April 1, 1973, they were obviously wrong. The record shows, nearly conclusively, that the sale occurred Sunday, April 1. The Government witnesses were positive about the date. Their testimony was corroborated by the fact that purchased substances were received by a Bureau of Narcotics and Dangerous Drugs forensic chemist, Marc D. Cunningham, at his Chicago office April 3.

To aid in reconstructing the time of the operative events, a calendar is set out:

**MARCH**

|    |    |    |    | 1  | 2  | 3  |
|----|----|----|----|----|----|----|
| 4  | 5  | 6  | 7  | 8  | 9  | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**APRIL**

| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
|----|----|----|----|----|----|----|
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |    |    |    |    |    |

---

The Assistant United States Attorney who tried the case for the Government could have cleared up the confusion either by producing records and reports kept by the investigating agents or by having Jovonovich and Hale testify.

2. Hale was described by Government witnesses as an "informant" and a "cooperative individual", apparently because he was employed on a contingent fee basis. He was paid $102 for the Smith case and a total of between $200 and $300 for his six or seven days of acting in the Carbondale area. The "measure of his success", as testified by a Government witness was the basis of this overall payment. Between six and eight people were arrested as the result of his activity. Hale worked in an Indiana steel mill plant and was known to Cronson, Clayton and Smith as "Indiana Joe." Prior to his Carbondale activity, he had been an informer for the federal Drug Enforcement Administration in Indiana, where he had "made a great many cases," according to the Government's evidence.

in terms like that." Hale and Jovonovich stayed at the trailer for about thirty to forty-five minutes and then left.

The following Wednesday Hale and Jovonovich were waiting outside the trailer about 5:30 in the afternoon when Cronson and Smith returned from Carbondale where Smith had taken his turntable to be repaired. (Cronson testified, "This Wednesday that we are talking about was approximately a week and a half before the sale.") Hale and Jovonovich talked to Smith and Cronson as to whether the boys could get some drugs. Hale told the boys, according to Smith's testimony, that he wanted to buy "a lot of hard chemicals to take back to Indiana to sell them so he could make more money to buy a large amount of hashish and he said that he came to Carbondale to get it." Cronson testified: "They asked us if we could get them some drugs and, in general, just tried to make some friendship with us to make a sale with them. The agents were not invited over to our trailer that Wednesday. We never invited them back." After eating supper with the boys, Hale and Jovonovich left the trailer.

The following Saturday around dinnertime undercover agent Steven W. Casteel accompanied Hale and Jovonovich to the trailer where they met Cronson, Clayton, and Smith. Casteel after being introduced told the boys that his wife had died and that he was back in school, having attended Southern Illinois University before. He said he was starting all over again, wanted to make some friends, and would like to purchase some drugs. Cocaine and LSD were mentioned. Smith testified that the agents "came on very strongly about how they wanted to make a fast possession and get it because large drugs really could be moved during a strong limit of time." Smith also testified that he told them that if they wanted to get any drugs the only place that he could think of would be "some low-rent park or on the street or at the dormitories." That Saturday evening young Smith and his girlfriend, Sandra Schenck, were in Merlin's bar located at the edge of Carbondale. Hale and Casteel were also there. Smith testified, "We were basically ignoring them, pretending they were not there, because we did not want to have anything to do with them. I pointed out to Sandy who they were."[3] Cronson was also in the bar on the same evening. He testified: "They [the agents] asked me if I could

---

3. Sandra Schenck testified for the defense. Her pertinent testimony was as follows:

Q Will you please state your full name?
A Sandra Lee Schenck, S C H E N C K
Q How old are you, Sandra?
A Twenty.
Q Where is your permanent home?
A In Schenectady, New York.
Q And you live down here in Carbondale?
A In Louis Park.
Q Were you contacted by Stephen Smith shortly after he was arrested?
A Yes.
Q Well, as a matter of fact, you saw him just immediately after he was arrested? At that time, you had a conversation?
A Yes, sir.
Q Do you know the day that Steve made a sale to these agents?
A It was a Sunday night—
Q Well, Let me ask, are you dating Stephen Smith on a steady basis?
A Yes, I am
Q And how long have you been dating Steve?

A A little over a year.
Q All right. With regard to the day that the sale took place, did Steve tell you that he had made a sale?
A Yes, that night.
Q And where was this at?
A At my sorority house.
Q What time was this, about?
A I would say around five-thirty that night.
Q Did he tell you which individuals he had made a sale to?
A No, he just said the creeps.
Q He called them the creeps?
A Yes.
Q Did he offer any explanation to you as to why he made that sale?
A To get them off his back.
Q Had you had conversations with Stephen Smith in the two or three weeks preceding that day?
A Yes.
Q Had he made reference to these persons during that time?
A Yes, he did.

get them any cocaine. I was just leaving when they were going in."

The next contact Smith had with the agents took place on Wednesday following the encounter at Merlin's bar. During the early evening, while all three boys were at the trailer and in the process of preparing their suppers, Hale and Jovonovich arrived uninvited. Clayton testified that this meeting was prior to the date of the sale. Clayton further testified:

> We were watching television, myself and my roommate Chris Cronson and one of my neighbors, Gary Wagner. They came in and sat down. The same type of questions were asked, and most of the time I'd have to ignore them or walk away, because they'd just keep, you know, consistently asking questions and I'd ignore them most of the time. And they stayed for about half an hour.

Cronson testified about the Wednesday meeting:

> The next time that I met with them was on a Wednesday, and at that time a neighbor was over, Gary Wagner, and he had come down to our trailer to borrow a kitchen utensil, and he

> Q Can you recall when Stephen Smith, when he first made reference to you concerning these fellows?
> A You mean the day, or—
> Q Well, the time period before the day he told you about the sale?
> A It was a couple of weeks.
> Q And, what did he first say to you, if you recall?
> A The first thing he told me was that Chris had got picked up hitchhiking by some creeps, and he called them creeps, and they had been running after him; they were always over at the trailer, being at the trailer all the time, and what they were after.
> Q Did you ever see these persons prior to the day that you were told by Steve that he was—
> A Yes, I did.
> Q And where did you see them?
> A I saw them at Merlins.
> Q And, is that a bar, a local bar?
> A Yes.
> Q Student hangout?
> A Right.

was there, and there was a show—we were watching this show and during that time Joe Hale and that man came in, knocked on the door and came in and sat down, and we smoked a marijuana cigarette, and they asked us if we could locate any drugs for them. . . . [T]he main thing that I remember is that they were interested in cocaine and LSD . . . .

Smith's version of that Wednesday meeting is:

> [I]t was suppertime, sir, we were cooking . . . . Bill Clayton, Chris Cronson, Gary Wagner, and myself were present in the trailer at that time . . . . Well, sir, I'm sure Joe Hale was there—I'm positive Joe Hale was there, and I don't perfectly recollect that Joe Jovonovich was there, but if Gary says that Joe and Joe were introduced to him, whenever the two came we always made a joke about Joe and Joe because it's a common name, and Gary had the names first.

Gary Wagner, a neighbor of the boys and a fellow student had come over to the trailer that Wednesday evening to borrow a kitchen utensil. Gary Wagner was called as a defense witness.[4]

> Q In Carbondale, Illinois, downtown Carbondale?
> A Yes.

4. Wagner's testimony in pertinent part reads:

> Q You recall, do you not, when Steve Smith was arrested, is that correct?
> A Yes, I do.
> Q Do you recall reviewing the events that led up to that arrest?
> A Yes, I do.
> Q Do you recall the review of events wherein you were present at the trailer on one occasion when the agents were present?
> A Yes, I do.
> MR. MERKEL: Your Honor, I would object to any further testimony until we establish a time.
> THE COURT: I would sustain the objection.
> MR. LAVELLE: You're right, Your Honor.
> Q Can you tell us, to the best of your ability the time that you met the agents

Significantly, the Government did not directly contradict the foregoing testimony of Clayton, Cronson, Smith or Wagner. The prosecutor could have called Hale and Jovonovich in rebuttal if he thought their testimony would contradict the defense witnesses as both were present during the trial but neither of them testified.

The Saturday following the Wednesday meeting Casteel and Hale again visited the trailer. Smith testified about this meeting:

Q All right, when did you next see any of these agents?

A It must have been the next Saturday, the Saturday following that Wednesday, sir.

Q And where was that at?

A That was in my trailer.

Q And what agents came to your trailer?

A Steven Casteel and Joe Hale.

Q And who was home with you at the trailer that day?

A I was there at the time.

Q Incidentally, let me just ask you this; did you at any time ever invite these persons to the trailer?

A No sir, or anybody else. We were kind of surprised when they came over as much as they did, because we weren't exactly warm when they did come over; we were rather cold.

Q Well, when they came, did they barge right in, or did they just walk right in or how were they—

A Well, when they first started coming over, I think they knocked, and we would say, "well, come on in", because we wouldn't say no to them. People that visited, we would say, "come on in." But, I think, toward the latter meeting with them, they just simply knocked and then walked

with respect to the sale, was it before or after the sale?

A It was before.

Q And how many weeks before the sale?

A I don't know exactly. I'd say close to a week or so. As I recall now it was a week before.

Q Do you recall the day of the week this was?

A It was early spring quarter, which would have made it April, early, which would—

Q The day of the week?

A The day of the week? No, I can't.

Q Was it a week day, or a weekend?

A It was a week day, because I had come to borrow a tape measure for dinner and we were all watching a show that was only on one day a week, on Wednesday, and since we were making a big meal, it had to be in the middle of the week.

Q Well, how many agents did you meet that day?

A I met two agents.

Q Were you first introduced to those agents that day?

A That was the first time I had ever seen them.

Q Do you know what names you were introduced—

A I was introduced to them as them being Joe and Joe.

Q Do you now know the names of those agents?

A Uh—

Q Do you see any of those agents present here today?

A No, I don't.

Q Have you seen any of those agents since you've been waiting around outside the courtroom here?

A Yes, I have.

Q Would you tell us what occurred in the trailer at that time?

A Well, I was sitting in the trailer when these two agents knocked on the door. And they walked in, and there was an exchange of hellos between Chris and Steve and then I was introduced to them as being Joe and Joe, and then the conversation led on where they were asking, you know, if there was any drugs for sale, and then Joe, the red-headed Joe, asked me if I knew where there was any drugs, and he asked me once again, he says, yes, like a pound of acid and stuff like that, and my remark was to him, you know, that he was crazy, and after that the talk about drugs was more or less, you know, dropped off, and we began watching television and marijuana was smoked by all including Steve, including myself.

in. Because there was always somebody at home.

Q They didn't necessarily wait for somebody to tell them, is that right?

A Not necessarily, no.

Q What were you doing in the trailer on this day that they came in?

A I was recopying my chemistry notes.

Q And tell us what happened in the trailer that day?

A Well, they came in and they began approaching me, "Could you get me some drugs" and I told them that I'd rather not; you know, if you want to get drugs, I'd prefer if you went to somebody else, and I don't want to be bothered with it, and they egged me on a little more.

Q What do you mean, "egged you on"? Proceed.

A Well they egged me on a little bit more and they said, "because we got to make a deal right away, right now", and they were really pressing for time, it seemed. So, I just told them, I didn't absolutely agree that I would do it, I'd leave the trailer to make a phone call, because we didn't have a phone in our trailer, and I took the keys to his auto and went down there and used the phone and I ran back and I said, "I can't get hold· of Chris."

Q You went to somebody else's trailer in order to use the telephone to try and get Chris?

A Yes.

Q Did you know whether or not Chris had a deal going with them?

A No, because Chris would not deal with them. Because he told me he didn't want to deal with them, and he wished they'd leave.

The next day, Sunday, about 3:00 P.M. Casteel and Hale again visited the trailer. Smith was there alone preparing to study. There had been no prior arrangement for their visit. Smith testified on direct examination:

Mr. Hale and Mr. Casteel walked in, and we exchanged greetings, and they said, "Well, you know, can you get us any drugs?" I said, "What do you want?" They said, "We're not particular; we'll take any quantity of any kind of drugs you can get." So, in the meantime, they sort of sat and, you know, so, I said, "O.K., I'll see what I can do . . . . Mr. Casteel told me, you know, that stuff will only take you half an hour. You know, you can do it in half an hour." I said, "No, I can't do it in half an hour." I said I didn't want to hear it. . . .

I said, "O.K., I'll see what I can do for you," and the following conversation we had if I would see any of Chris's friends. I said, "Yes, I do; we have the same friends approximately." And they said, "Well, why don't you just go over to his house and see what you can get for us?" And, so I said, "O.K., I'll do it for you." And they left, and I changed my clothes, and I left about, oh, I'd say about, oh, I'd say about fifteen minutes after they left. And, I went to this guy's [Roger] house. . . . When I got to Roger's house, I said, see, we had told Roger about these people coming over to our trailer, and we'd been basically ignoring them, and he knew all about it, and I said, "Well, I decided I'd go get some," and after talking with him and he knew who I'd give it to, he said, "Well, I can make a couple of phone calls." So I sat down and Roger made, I don't know, he could have made two or three phone calls, and after he got through with the phone calls, and he had talked to a buddy, and that he has one ounce of cocaine and one ounce of MDA. And I said, "Well, tell him we'll need both. That's good for them."

About an hour later Smith drove to the hotel where Hale and Casteel told Smith he should meet them. Casteel testified:

Approximately five o'clock in the afternoon that same day. My supervisor, special agent Stephen Bushendorf, Mr. Hale and myself were seated in

Room 154, waiting for his [Smith] knock at the door.

Q What happened after the knock on the door?

A The knock took us somewhat by surprise; Agent Bushendorf then proceeded to the bathroom section of the motel room where he hid for the next few minutes. And at that time I opened the door and Mr. Smith entered.

Q So at this time present in the room were Mr. Smith, agent Bushendorf, did you say, yourself, and your confidential informer?

A Yes sir.

Q What happened, did you admit the defendant to the room?

A He came in the room, and at that time stated that he had been able to make the arrangements, that I could purchase an ounce of cocaine for $1,050 or an ounce of MDA for $375, and he asked me what I wished to do. At that time I told him I would purchase the ounce of MDA and would like a small sample of the cocaine in order to decide if it was a sufficient quantity of strength for me to make an additional purchase from him at a later date.

Q And, did you have any further conversation?

A Yes, sir; at that time Mr. Smith asked if he could use my phone and he placed a local call to a subject that he called Roger, and he told Roger, first of all, that I had taken the ounce of MDA and a sample of coke, and asked if everything would be all right. Apparently the subject on the other end said yes, and he said, "O.K., I'll be over and get it in a few minutes," then he discontinued the conversation. He then turned to me and said he would be back in approximately an hour.

Q Did you hear him use the word over the phone, MDA?

A Yes, sir.

Q And cocaine?

A Excuse me sir, he may have said coke, instead of cocaine. It's used as a brief term for it.

Q After the telephone conversation, what did the defendant do?

A He then exited the room, out of my sight. We didn't have any other conversation with him until later on.

Smith's version of the events on Sunday continued:

I told them [the agents] my connection [actually Roger's connection, one Scott] did have access to one ounce of MDA, and cocaine . . . they said, "O.K., we've got enough money for the cocaine . . ." I told them, "O.K., I'll be back in about an hour." And they said, "O.K." Mr. Casteel told me that he just wanted a sample of the cocaine . . . . Then I left, and I ran out back around back to my car, and I drove back over to Roger's house. All right, after seeing as though Roger had—in his conversation with Scott, had dipped around to where Scott would be at that time, so he got to the restaurant to a party, picked up Scott, and then we drove to Scott's house and picked up a sample of cocaine, which he wrapped in some waxed paper and gave it to me, and I held it cupped in my hand. And then from Scott's house we drove approximately four miles or three miles north on old Route 13 to a farmhouse where he picked up one ounce of MDA. Then we went—he wanted to make his trip worthwhile, so we stopped at Save-Mart and picked up a gallon of paint for what purposes I have no idea, and then drove back, dropped Scott out at the party and Scott said, you know, told Roger that he could give him the money for the MDA later, that it wasn't important that he have it then. . . . Scott told that to Roger, and while we were driving Scott and Roger, you know, were asking me questions about the two people I was about to deal with, how well did I know them, I said, "Well I just met them a couple of weeks ago through Chris."

And they were asking me, like, "Did they seem to you like they were real clean people, you know?" and they asked me whether, and we sort of agreed that I should check their wallets to make sure there were no agents in there before I gave them the drugs. So I agreed. I said, "O.K., I'll do that", just, you know, for personal safeness, so then we drove back to the Ramada Inn and parked on the east side of the Ramada Restaurant. I ran from the car and I had the MDA in my pocket here and I had the cocaine in my fingers, just like this.

After Casteel handed the defendant $375 for the purchase, Smith testified he told the agents:

All right, you got the sample of cocaine, if you want any more cocaine go to somebody else. Now you know where to get it, if you want it you have to go to Chris or Bill, and their sellers.

Smith returned to Roger Laut's home where Smith gave Laut the $375. He kept none for himself. He intended to make no profit for himself. He was arrested May 17, 1973. Except for the instant sale, he has never bought, sold, or used MDA, cocaine or any other illicit drugs.

In the presentation of its case, prior to the testimony of Smith, Cronson, Clayton, Wagner and Schenck the Government had called Steven Casteel as one of its witnesses. He testified he had been a county deputy sheriff prior to his employment in April 1972 by the Bureau of Narcotics. He was assigned to the investigation at Carbondale in February 1973 along with four or five other agents. His testimony continued:

Q Prior to your meeting Stephen Smith on April 1st, after you had made contact with Stephen Smith, others of the unit and yourself?

A Other members of the unit had made contacts with his roommate.

Q Who, that is, what members of the unit had made contact with Mr. Smith prior to that day?

A Special Agent Jovonovich.

Q What is it?

A Jovonovich.

Q Jovonovich—Joseph Jovonovich?

A Yes, sir.

Q And who else?

A I believe that's it.

Q Had you met Chris Cronson?

A I may have possible met Mr. Cronson the day before April 1st. In a bar I met several individuals; I possibly did meet Mr. Cronson then, and so I would have had contact with him.

Q Did you have previous contact?

A No, I don't recall ever meeting Mr. Smith earlier.

Q You described Joseph Jovonovich as a Special Agent?

A Yes, sir, he is.

Q Do you know whether or not any other agents had met Mr. Smith prior to the day that you met him?

A Not to my knowledge, no.

Q Well, do you know how it was that Mr. Smith was ever first introduced to you?

A I can only relate certain information.

Q Well, insofar as the leading question, that was your first contact with Mr. Smith, in the trailer, is that correct?

A Yes, sir, that was my initial contact with him, as far as I can recall.

Q Following that day, did you have contact with Mr. Smith?

A Yes, sir.

Q Approximately how many occasions prior to the arrest?

A I would say approximately three or four. At the time I was introduced to him at the trailer following—during the investigation, I believe I also met Mr. Smith one time downtown; he drove by in his car, and we engaged in conversation.

Q When you met with Mr. Smith, following the date in question, what was the purpose of your meeting? Why did you go to him?

A I was attempting to make an additional drug purchase; for example, cocaine, which he stated he would sell to me the next day.

Q And did Mr. Smith engage in any further sales?

A No, sir. He stated that his only source of supply had sold all that he had at that time, and it would be a while yet before he would be able to offer any more illicit drugs for sale to me.

Q Did Mr. Smith at any time tell you that he did not want to deal in drugs, or become involved in the sale of drugs?

MR. HESS: Your Honor, I'm going to object to this question; it calls for hearsay.

THE COURT: Sustained. Proceed.

MR. LAVELLE: Your Honor, the question involved is a direct response to the conversation—

THE COURT: Go on to the next question. You are just stalling around. You may proceed.

Q In any conversations with you, during the times that you met Mr. Smith, following the date in question, did Mr. Smith tell you that he did not want to deal with drugs?

A I don't recall hearing him say.

Q Do you recall meeting Mr. Smith on Mother's Day, in town, on Sunday? While he was on the telephone?

MR. HESS: Your Honor, I'm going to further object to the line of questioning, as I am unable to, having followed it for some time, to determine what materiality any visit on Mother's Day would have to the offense charged on April 1st.

THE COURT: Sustained.

MR. LAVELLE: I might suggest a basis for my line of inquiry, Your Honor. The defendant was—for a period of time following the sale, there were further attempts made to my client to induce him to—

THE COURT: Now, I'm going to sustain the objection. Proceed.[5]

Stephen Bushendorf an agent for the Drug Enforcement Administration conducted a surveillance by Agent Casteel and informant Hale at the trailer in Edgewood Mobile Estates in the afternoon of Sunday, April 1. Later he followed them to the Ramada Inn where

**5.** It can be argued that Casteel's testimony that he could not recall meeting Smith prior to April 1 and the defendant's evidence that there were three previous occasions, Saturday [April 24], Wednesday [April 27], and Saturday [April 31], when Casteel had visited the trailer created a sufficient conflict in the evidence so as to preclude us from critically looking at the entrapment issue as a matter of law. I do not think this argument is valid when the entire record is considered or even when Casteel's testimony alone is looked at carefully. For example, a close reading of the following questions and answers would indicate that Casteel and Smith met only once after the April 1 sale:

Q *Following that day,* did you have contact with Mr. Smith?

A Yes, sir.

Q Approximately how many occasions *prior to the arrest?*

A *I would say approximately three or four.* At the time I was introduced to him at the trailer following—during the investigation, *I believe I also met* Mr. Smith one time downtown; he drove by in his car, and we engaged in conversation.

Q When you met with Mr. Smith, following *the date in question,* what was the purpose of your meeting? Why did you go to him?

A *I was attempting to make an additional drug purchase;* for example, cocaine, which he stated he would sell to me the next day.

Q And did Mr. Smith engage in any further sales?

A No, sir. He stated that his only source of supply had sold all that he had at that time, and it would be a while yet before he would be able to offer *any more illicit* drugs for sale to me. (Emphasis added.)

At the very least Casteel's testimony as to the number and dates of the occasions when he had contact with the defendant is ambiguous and subject to different inferences. At this point I cannot help but observe that the record indicates to me that the case was loosely tried, by counsel for both the Government and the defense. Some of the judge's evidentiary rulings are also difficult to understand.

Casteel, Hale, another agent and he "discussed the case." Bushendorf testified that he had given Hale, who held a full-time job in an Indiana steel mill, the sum of $300 for six or seven days part-time work in Carbondale. He further testified that he used "the measure of [Hale's] success" for giving him this money, although Hale would have received per diem allowance in any event.[6] Bushendorf indicated that during the period of Hale's activities in Carbondale, March 15 to May 17, he was never assigned to any specific case, that written records were not kept on all of Hale's activities, but that he believed that there was a written record of the Smith case. He stated that members of his unit did visit the Smith trailer, but the total number of visits was no more than three.

Although all of the young men involved in this case insisted that the events leading up to the sale by Smith happened at least in part after April 1, a careful, intense reading of the record makes a number of things clear. There was only one sale. The sale occurred on April 1. The events leading up to the sale are not in dispute. Obviously the boys were wrong as to the actual calendar dates of the events, but this does not destroy their credibility as witnesses with regard to the events which happened before the sale took place.

The Government's brief on appeal states:

Hale and Jovonovich first visited the trailer of the defendant on Saturday, March 31, 1973, and . . . they did not meet Stephen Smith on that day. There is substantial evidence to show that the defendant sold the drug to Agent Casteel on April 1, 1973, the following day, and that April 1, 1973, was the first time the defendant met any agents or informants.

That statement is belied by the record.

The statement makes no sense; it flies in the face of logic when the totality of the evidence is considered.

Although I am strongly inclined to believe the facts point to a finding of entrapment as a matter of law, I refrain from so arguing because of the obvious confusion by Cronson, Clayton, and Smith over the calendar dates of the events surrounding the sale. I believe, rather, that the conviction should be set aside and the case remanded for a new trial. I shall deal with this ultimate conclusion on my part at the end of the dissent.

In my view the facts here are even stronger than those in Sherman v. United States, 365 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1957), a case holding that there had been entrapment as a matter of law. The defendant in his brief on appeal has compared the facts of the two cases with each other, setting forth his analysis. I adopt that comparison as my own.

1. In Sherman v. U. S. there was a series of sales. In this case there was a single transaction.

2. In Sherman v. U. S. there was no evidence that the defendant was in the narcotics trade. Likewise, here.

3. In Sherman v. U. S. there was no significant evidence that the defendant made a profit on any of the sales. In this case there is absolutely no evidence that the defendant made a profit on the singular transaction.

4. With respect to a possible "ready complaisance" or predisposition to accede to the informer's requests for the illicit narcotics, in Sherman v. U. S. the defendant had a record of past convictions for both possession and selling narcotics, while in the present case there is no evi-

---

**6.** It is interesting to note the language actually used by Bushendorf to describe the activities for which Hale was paid:

Q   And what was that phase of his work upon which his payment would be based?

A   Well, as I testified before, it would be based upon the people to whom he introduced us and the places where he was present with the *entrapment* of other people . . . . (Emphasis added.)

dence of past charges or convictions of any kind. Indeed, the defendant's history in the present case appears to be exemplary.

5. In Sherman v. U. S. the informer testified but the defendant did not testify. In the present case the defendant did testify, but the government did not call as witnesses the informer, Joe Hale, or the government agent, Joe Jovonovich, who were the principals in the pre-sale meetings with the defendant wherein the entrapment was engendered.

6. In Sherman v. U. S. the informer was not paid for ensnaring the defendant. In the present case the informer, Joe Hale, was paid a bounty on a contingent fee basis for entrapping the defendant which is a practice that is subject to criticism and in itself the basis for reversal of a conviction.[7]

Aside from the obvious confusion of the three boys about the calendar dates, the unequivocal facts in the present case establish entrapment.

The law does not permit those entrusted with its enforcement to create situations leading to criminal conduct so as to ensnare a person who, though weak, does not possess a predisposition to crime. Judges must ever be alert to see that the law is not perverted. If they blink at such happenings our confidence in justice would be sorely undermined.[8] I am reminded of Holmes' characterization of the concept of the law in the form of a woman at the side of the road.[9] By what has happened here her face is distorted by shame; her eyes blinded by tears. Here we have a young, twenty-two year old youth, his college career brought to naught, his life ruined because of the machinations of overeager government agents and informers who wanted to "make" criminal cases rather than discover pre-existing illegal activity.

After much agony, I have concluded, however, that the case does not call for an outright reversal. Because of the conflict over dates, I think the wiser course is to reverse and remand for a new trial. For that approach I find support in United States v. Bueno, 447 F.2d 903 (5th Cir. 1970). There the Fifth Circuit said:

There are two controlling questions on the appeal of this narcotics conviction. The first is whether there is entrapment as a matter of law when a government informer furnishes the narcotics to the defendant for sale to a government agent. The second is whether the government has the duty of coming forward with contrary evidence when the defendant testifies to uncontradicted facts that would constitute entrapment as a matter of law, and there is no evidence to show that his testimony is untrue.

Holding that the uncontradicted facts testified to by defendant constitute a good defense on the ground of

---

7. In Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), a conviction was reversed because of a contingent fee arrangement aimed at particular individuals. The court stressed that no evidence was introduced to show either that the Government had reason to suspect these individuals of wrongdoing or that the informant had carefully been instructed on the rules against entrapment. I suggest this approach as an independent ground for reversal and a remand for a new trial.

8. As a New York Times editorial of November 26, 1974, p. 38, said: "Faith in the judicial system depends on the people's belief that the law provides redress for deliberate violation of their rights."

9. "When I think of the Law as we know her in the courthouse and the market, she seems to be a woman sitting by the wayside, beneath whose overshadowing hood every man shall see the countenance of his deserts or needs. The timid and overborne gain heart from her protecting smile. Fair combatants, manfully standing to their rights, see her keeping the lists with the stern and discriminating eye of even justice. The wretch who has defied her most sacred commands, and has thought to creep through ways where she was not, finds that his path ends with her, and beholds beneath her hood the inexorable face of death." O. Holmes, "The Law" in Collected Legal Papers at 27–28.

entrapment, and that the government failed to carry the burden of going forward with contradictory evidence, we have no alternative but to reverse this conviction.

The case has three principal participants—the Defendant, the Informer, and the Government Agent. As between the Government Agent and the Defendant, the Agent's testimony clearly supports the conviction.

\* \* \* \* \* \*

The question then comes as to whether the government can rest on the challenge to the credibility of the Defendant, or whether it must come forward with some contradictory evidence.

\* \* \* \* \* \*

The government's case cannot rest on the mere fact that he entered into the Informer's plan willingly.

Neither party produced the Informer. If the Informer's testimony would tend to disprove the Defendant's story, it was up to the government to produce him. The Defendant having testified to facts which establish a defense as a matter of law, the government has the duty to come forward with contrary proof, if it is to carry its ultimate burden of proving guilt beyond all reasonable doubt. United States v. Groessel, 440 F.2d 602 (5th Cir. 1971).

Thus, we hold that the conviction on this record must be *reversed and the case remanded for retrial.* If the government cannot come forward with evidence that contradicts Defendant's testimony, then he is entitled to discharge, as a matter of law. If the government produces evidence sufficient to raise a jury question, then the case should be submitted with proper instructions in accordance with this opinion.[10] (Emphasis added.)

The defense testimony having established a prima facie case of entrapment, the Government had the duty to produce contrary proof if its obligation to establish guilt beyond a reasonable doubt was to be discharged. The Government called neither Hale nor Jovonovich, despite their presence, to contradict the defense witnesses relating to the pre-sale activities and to help establish the true time sequences. Nor did it produce any records or reports of those activities.

It relied solely on the witnesses who were acquainted with the events on the day of the sale. That was not enough under the circumstances. The Government had the duty to bring out all the facts. We hardly need to be reminded again of the statement in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

To prevent a strong possibility of manifest injustice to the defendant I would reverse and remand for a new trial.